## THE CREDIT COMPANY, LIMITED, vs. THE HOWE MACHINE COMPANY.

Fairfield County, March T., 1886. PARK, C. J., CARPENTER, PARDEE, LOOMIS and GRANGER, Js.

The defendant was a manufacturing corporation of this state, having its principal office in the city of New York, and limited by its charter to such use of mercantile paper as should be necessary to the convenient prosecution of its business, which paper its treasurer, by vote of its directors, was authorized to execute for the company. S, who had been its president and was still a large stockholder, drew drafts upon the company in London, England, where he was engaged in stock speculations, which were accepted by the treasurer of the company, but were subsequently protested for non-payment. S had previously had large funds in the hands of the company, against which he had previously drawn, and the drafts had been accepted and paid, but at the time the protested drafts were made his account was largely over-

drawn and the acceptance of them was for his accommodation. These drafts, at the time they were drawn, and before acceptance, were discounted by the plaintiff company, through *W*, who was a member and its managing director, and the proceeds were delivered to *S*, and by him at once placed to his credit with *W & Co.*, a firm to which he was largely indebted and of which *W* was a member. The plaintiff company had previously discounted for *S* like drafts, which had been accepted and paid; and the treasurer of the defendant company had previously accepted drafts of *S* for his accommodation, with the knowledge of the directors. In a suit upon the drafts it was held—

1. That though the defendant company had power by its charter to deal only in mercantile paper necessary to its business, yet as it had that power it would be holden by the acceptances in question except against a party who took the paper knowing that they were accommodation acceptances.

2. That the plaintiff company established a *primâ facie* case when it presented the drafts duly drawn and accepted, there being no circumstances to indicate fraud or illegality, and that the burden of proving that the plaintiff company had knowledge of the accommodation character of the acceptances was on the defendant company.

3. That the whole question became therefore—whether the plaintiff company took the paper in good faith for value.

4. That it did not follow that it took it in bad faith because of the object for which *S* procured the money, since he might have drawn upon funds of his own in the defendant's hands, and if so the intended use of the money was of no consequence.

5. That it did not affect the position of the plaintiff company that it discounted the paper before acceptance, and that no new consideration passed from it to the defendant company upon the acceptance.

6. That the plaintiff company was not to be regarded as not a holder for value by reason of the fact that the money obtained was placed to the credit of *S* with *W & Co.*, to whom he was indebted; since the fact that *W* was a member and managing director of the plaintiff company and also a member of *W & Co.* did not create a community of relation to the transaction on the part of the two companies.

While it is a general rule that persons dealing in commercial paper of a corporation are bound to take notice of the extent of its power, yet a distinction is to be observed between the terms of a power and the circumstances under which it is exercised. Parties may well be required to take notice of the former, but to require them to take notice of the latter would frequently result in gross injustice.

Especially is this so where the officer of the corporation which exercises the power at the same time represents the corporation and speaks for it in giving information as to the circumstances under which it is exercised.

In the present case the treasurer of the defendant company, who, by virtue of his office, was the proper person to accept drafts on the company, was also the person held out by the corporation as the proper one to inform holders of drafts whether they were drawn on funds of

the drawers; and by accepting the drafts in question he practically declared that they were so drawn.

[Argued May 6th—decided December 17th, 1886.]

ACTION upon four acceptances; brought to the Superior Court in Fairfield County. The case was referred to a committee by whom the following facts were found :—

On the 16th day of March, 1877, A. B. Stockwell drew upon the Howe Machine Company, the defendant, four drafts, viz.: One for $10,000 gold; one other for $10,000 gold; one other for $10,000 gold; and one other for $15,000 gold. All the drafts were made payable at ninety days' sight. All of them were addressed to the Howe Machine Company, 28 Union Square, New York, and all were, on April 21st, 1877, accepted as of April 7th, 1877, by Levi S. Stockwell, as treasurer of the Howe Machine Company.

On the 26th day of March, 1877, the Credit Company (Limited), the plaintiff, at the request of A. B. Stockwell indorsed these four drafts and sold them through a broker, James E. Barker, who also endorsed them, to Samuel Montague & Co. of London, foreign bankers, for £8,928 10s. 3d.

These four drafts were presented for acceptance to the Howe Machine Company, 28 Union Square, New York, on the 7th day of April, 1877, and acceptance was at first refused, and the drafts were protested. Subsequently, and within a few days thereafter, on April 21st, 1877, all of the drafts were accepted as of the date of April 7th, 1877, the day when they were first presented for acceptance, in the manner above specified.

When the drafts became due and payable they were not paid; they were duly protested for non-payment, and upon notice of their non-payment the plaintiff, being an indorser thereon and payee therein named, paid Samuel Montague & Co. the amount of the drafts and charges, and now holds the same. The drafts have never been paid to the plaintiff by the Howe Machine Company, nor by any person.

One of the drafts was as follows :—

"LONDON, 16th March, 1877.
"No. 7024.    Exchange for $10,000 gold.

"At ninety days' sight pay this first of exchange, second unpaid, to the order of the Credit Company, Limited, ten thousand dollars gold, value received, which place to account.

"A. B. STOCKWELL.

"To the Howe Machine Company,
         28 Union Square, New York."

Across the face of the draft was written the following:

"Accepted, April 7th, '77, payable 28 Union Square.
           "THE HOWE MACHINE CO.
           LEVI S. STOCKWELL, Treas."

And it was indorsed as follows:—

"Pay H. J. Barker, or order, for value received, for the Credit Company, Limited.    J. HUME WEBSTER, *Director*.

"Pay Messrs. Samuel Montague or order, value received.
                 "HENRY J. BARKER."

The others were like the above in their tenor, indorsements and manner of acceptance, varying only in their amounts.

The Howe Machine Company was organized as a joint stock corporation under the laws of this state in January, 1865, for the same purposes as the present specially chartered corporation.    On its organization it adopted by-laws which have ever since been the by-laws of the present corporation.    Among them are the following:—

"Art. 4. The officers of said corporation shall consist of six directors, who shall be stockholders and be chosen by the stockholders by ballot; a president, who shall be chosen by the directors from their own number by ballot; and a secretary and treasurer, who shall be appointed by the board of directors.

"Art. 7. It shall be the duty of the treasurer to have the charge and oversight of the receipts and disbursements of this corporation and board of directors, and keep, or cause to be kept, an accurate account of the same.

"Art. 9. All papers relating to the business of the corporation shall be signed by the president, or by such other person as the directors shall appoint for that purpose at any legal meeting, and by no other person, and such appointment shall be duly entered on record.

"Art. 13. No officer or agent of this corporation shall be allowed or have any right or power to sign, indorse or pledge the name or credit of the corporation, or to use, pledge or dispose of the property or funds of the corporation except for the sole use and benefit of the corporation."

At the May session of the General Assembly of this state, 1871, the Howe Machine Company applied for a special charter, which was granted. The charter contained the following provisions :—

"Sec. 2. Said corporation shall be and remain a body politic and corporate by said name of the Howe Machine Company, located at said Bridgeport, and shall have and enjoy their said corporate franchise, and all the rights and privileges herein granted, for the purpose of manufacturing sewing machines, machinery, and tools of all kinds, metallic castings, forgings, lumber, cases, and any and all other articles and things composed in whole or in part of metal or wood, which they shall deem expedient; and may conduct such mercantile business as may be convenient in connection with such manufacture.

"Sec. 3. * * * The capital stock of said corporation shall be deemed personal property, and shall be transferable only on the books of said corporation, in such manner as its by-laws shall prescribe. And said corporation shall at all times have a lien upon the stock and property of its members, invested therein, for all debts due from them to said corporation."

At the annual meeting of the company held on the 1st day of January, 1872, the charter was accepted by the company. Upon its acceptance no change was made by the corporation in its manner of conducting its business. The same books of account which were in use under the joint stock organization continued to be used after the charter was ac-

cepted. The same by-laws adopted under its joint stock organization continued to be the by-laws under the charter. The stockholders and officers of the company were the same before the charter and after it was accepted.

The Howe Machine Company was located in Bridgeport, but had its principal business office in New York city, and in the year 1877 its office there was at 28 Union Square.

A. B. Stockwell for many years previous to January 1st, 1877, was president of the Howe Machine Company, and Levi S. Stockwell, his brother, was during that time treasurer of the company. About the 1st of January, 1877, Levi S. Stockwell was elected both president and treasurer of the company, and continued such until August 15th, 1877.

The Credit Company (Limited) is, and was at the time of the transactions herein named, a financial institution located in London, England, and engaged in discounting and buying bills, making loans, &c.

J. Hume Webster is, and was during the transactions in question, the managing director of the Credit Company, and is and was also a member of the firm of Hume Webster & Company, of London, bankers.

The Howe Machine Company was and is engaged in the manufacture and sale of sewing machines.

The Credit Company, on making sale of the four drafts, paid over the proceeds of the same, less commissions, to A. B. Stockwell, and he placed them to his account with Hume Webster & Co.

In the spring of 1874 A. B. Stockwell went to London, England. He presented letters of introduction to J. Hume Webster, the managing director of the Credit Company, and at the same time represented that he was president of the Howe Machine Company; that he was the principal stockholder ; that he had the right to pledge the credit of the company, and was their representative in Europe ; and that the business was very profitable. He was, in fact, at that time president of the company, and was the principal stockholder, having more than three fourths of the stock of

the company; the whole stock being forty thousand shares of $25 each; Levi S. Stockwell, the treasurer, having nearly all of the remainder of the stock, there being less than one hundred shares owned by other parties.

The Credit Company, relying upon these representations made to its managing director, had the following business transactions with A. B. Stockwell and the Howe Machine Company, to wit:—May 29th, 1874, the Credit Company, at the request of A. B. Stockwell, discounted two drafts of the Howe Machine Company, per N. P. Stockwell, agent, on the agent of the Howe Machine Company in Belgium. The proceeds of these drafts were paid to A. B. Stockwell, and the drafts at maturity were paid. On the 19th of October, 1874, the Credit Company made a loan of £9,500, upon the obligations of A. B. Stockwell, the Howe Machine Company, and the Howe Machine Company (Limited) of London, secured by mortgage on the property of the last named company at Glasgow, which loan was paid at maturity. During the years 1875 and 1876 the Credit Company discounted or negotiated other bills indorsed or drawn by the Howe Machine Company, per A. B. Stockwell as president, the amounts and dates of which were not stated in the evidence. In December, 1876, A. B. Stockwell drew drafts on the Howe Machine Company to the amount of $45,000, which drafts were similar to the drafts in suit, were accepted by the Howe Machine Company in the same manner as the drafts in suit, and were paid by the company at maturity. On February 6th, 1877, A. B. Stockwell drew on the Howe Machine Company drafts to the amount of $30,000, which were in similar manner accepted by the company and paid at maturity. On March 28th, 1877, A. B. Stockwell drew drafts on the Howe Machine Company to the amount of $30,000, which drafts were similar to the drafts in suit, and were accepted and paid by the company. All of these drafts were negotiated by the Credit Company for A. B. Stockwell in a similar manner to the drafts in suit.

At the time A. B. Stockwell presented his letters of intro-

duction to the managing director of the Credit Company, he also presented an instrument under the seal of the Howe Machine Company, describing him as president of the company and purporting to give him power to deal with and pledge the credit of the company, but by whom this instrument was executed the committee was unable to determine from the evidence offered. There was no evidence to show that the company authorized such an instrument to be executed.

At a directors' meeting of the Howe Machine Company, held on the 29th of May, 1865, the following vote was passed :—

"*Resolved*, That the treasurer be, and he hereby is, authorized and empowered to make, sign, indorse and accept notes, checks and bills of exchange in the name and for and on account of this company, and generally to execute any and all papers relating to the business of the company."

At a meeting of the directors of the company, held November 2d, 1874, the following votes were passed :—

"*Resolved*, That Levi S. Stockwell, the treasurer of this corporation, be and is hereby designated and appointed to sign, execute and deliver all instruments and papers pertaining to the business of the corporation.

"*Resolved*, That the corporation hereby ratifies and confirms all and singular, the papers, bonds, undertakings, deeds and other instruments of whatever kind or nature heretofore signed, executed or delivered in the name of this corporation by Levi S. Stockwell, treasurer."

During the years 1876 and 1877 Levi S. Stockwell, as treasurer, exclusively accepted drafts drawn on the Howe Machine Company.

On the 6th day of February, 1877, A. B. Stockwell sold to Cornelius K. Garrison, of New York, twenty-two thousand shares of the Howe Machine Company stock standing in his name, for the sum of $200,000. On the transfer books of the company the shares were transferred as of date of January 31st, 1877. The agreement of sale was in writing, and there was attached to it another agreement signed by Gar-

rison by which the latter bound himself to re-transfer the stock to Stockwell within six months on Stockwell's paying him $200,000 in cash. These shares were transferred to Garrison in good faith on the terms above stated. Stockwell did not re-purchase them, and Garrison now owns the shares.

A large proportion of the money paid by Garrison for these shares was paid to the Howe Machine Company, and credited to the account of A. B. Stockwell on the books of the company.

A. B. Stockwell, for many years previous to the acceptance of the bills in suit, and subsequent thereto, had an open account with the Howe Machine Company on its books. He deposited large sums with it, and drew on it in large amounts, frequently overdrawing his account, and at the time of the acceptance of these drafts his account was largely overdrawn. The account shows that the company frequently paid his private bills. The directors and stockholders of the company had knowledge of these accounts between the company and A. B. Stockwell, and that Levi S. Stockwell, the treasurer, was accepting drafts drawn on the company by A. B. Stockwell, and there was no evidence that they ever objected to these transactions.

Sometime in the years 1876 and 1877 A. B. Stockwell was engaged in speculating in stocks in London, and kept an account with said Hume Webster & Co. J. Hume Webster, the senior partner of the firm, and the managing director of the Credit Company, had knowledge of these speculations, and that the money obtained by A. B. Stockwell, on the drafts drawn by him on the Howe Machine Company, was used by him in his stock speculations. It did not appear from the evidence that the other members of the firm of Hume Webster & Co. or of the Credit Company had such knowledge.

Samuel Montague & Co., who purchased the drafts in suit, had no knowledge that the money obtained thereon by A. B. Stockwell was used by him in his private transac-

tions, and not in the business of the Howe Machine Company.

Neither the Credit Company nor Hume Webster & Co. had any knowledge of the charter or by-laws of the Howe Machine Company.

Upon the trial of the cause the plaintiff offered evidence of the custom of bankers in London as to negotiating foreign bills before acceptance. The defendant objected to the evidence as irrelevant and immaterial. The committee received it subject to objection, and from such evidence found that it is the usual custom there to negotiate foreign bills before acceptance. The plaintiff also offered evidence to show the reason for negotiating foreign bills before acceptance, which evidence was objected to by the defendant as irrelevant and immaterial, and was not received by the committee.

The plaintiff offered evidence to prove the course of business of the Howe Machine Co., and the power of its treasurer to accept drafts, and its acceptance of drafts previous to its charter granted in 1871. The defendant objected to the evidence as irrelevant and immaterial. The committee received it subject to objection.

If, upon the foregoing facts, the law is so that the defendant is liable to the plaintiff for the four drafts in question, by reason of the acceptance of the same by the treasurer of the defendant in the manner hereinbefore described, then the committee found that there was due the plaintiff from the defendant, on the 29th day of December, 1883, the sum of $62,475. If, upon the facts, the law is so that the defendant is not liable to pay to the plaintiff the drafts in question by reason of such acceptance by the treasurer of the defendant, then the committee found that there was nothing due the plaintiff from the defendant.

Upon these facts the case was reserved for the advice of this court.

*R. S. Ransom* of New York and *E. W. Seymour*, for the plaintiff.

1. The fact that drafts drawn on the defendant had been negotiated several times previously by the plaintiff and were accepted and paid at maturity, is alone sufficient to estop the defendant from claiming that Stockwell was not authorized to draw or negotiate the bills. Story on Agency, § 54; *Van Wyck* v. *McIntosh*, 14 N. York, 442; *Farmers' & Mechanics' Bank* v. *Butchers' & Drovers' Bank*, 16 id., 145; *Olcott* v. *Tioga R. R. Co.*, 27 id., 546; *Fulton Bank* v. *N. York & Sharon Canal Co.*, 4 Paige, 127; *Lester* v. *Webb*, 1 Allen, 56; *Lyndeborough Glass Co.* v. *Mass. Glass Co.*, 111 Mass., 315; *Glidden* v. *Unity*, 33 N. Hamp., 571; *Peterborough R. R. Co.* v. *Nashua & Lowell R. R. Co.*, 59 id., 585; *McLaughlin* v. *Detroit & Milwaukee R. R. Co.*, 8 Mich., 100. An instrument being attested and being sealed with the seal of the corporation, is valid even if there was no evidence to show that the company authorized such an instrument to be executed. The authority to affix the seal will be presumed. The fact that the drafts were drawn on the defendant is proof of express authority to pledge the credit of the company. *Canandaigua Academy* v. *McKechnie*, 26 N. Y. Supreme Ct. R., 62, 67; *Lovett* v. *Steam Sawmill Association*, 6 Paige, 54; Potter on Corporations, § 39 and note 14, and cases therein cited.

2. It would be a sufficient answer to what is alleged by the defendant—that these bills were not drawn or accepted, or used in the business of the corporation, and that the acts of the officers were in excess of their powers—to say that the corporation had power to make contracts to raise and expend money, and in doing so to make notes and draw, indorse and accept bills of exchange. 1 Parsons on Notes & Bills, 164. And having such rights and powers, negotiable papers, made, drawn and indorsed or accepted by the company, by its proper officers, would in the open market, or in commercial transactions, be governed by the law applicable to such papers, and the rights of *bonâ fide* holders of such paper would be unaffected by the object or purpose for which such notes or bills were made or accepted. Potter on Corporations, § 547; *Safford* v. *Wyckoff*, 4 Hill, 442; 1

Parsons on Notes & Bills, 164, 165; *Stoney* v. *American Life Ins. Co.*, 11 Paige, 635; *Farmers' & Mechanics' Bank* v. *Butchers' & Drovers' Bank*, 14 N. York, 631 to 633; *Mechanics' Banking Association* v. *White Lead Co.*, 35 id., 505. Where an act is absolutely prohibited by statute, or illegality appears on the face of the contract, the corporation is not bound; but where, as in this case, the contract is a bill of exchange which the corporation can draw or accept for some purposes, the acceptance is not void in the hands of a *bonâ fide* holder, no matter what the bill was drawn or accepted for, even if drawn and accepted "for a purpose and at a place not authorized by the charter, and in violation of the laws of the state where it was actually issued." The distinction is clearly drawn in the following cases: *Stoney* v. *Am. Life Ins. Co.*, 11 Paige, 635; *Safford* v. *Wyckoff*, 4 Hill, 442; *Vallett* v. *Parker*, 6 Wend., 615; *Farmers' & Mechanics' Bank* v. *Butchers' & Drovers' Bank*, 14 N. York, 631. See also Potter on Corporations, § 547. All corporations of a nature similar to the defendant have power to draw or accept bills of exchange. 1 Parsons on Notes & Bills, 164; *Barker* v. *Mechanic Ins. Co.*, 3 Wend., 94; *Mott* v. *Hicks*, 1 Cowen, 513. If the officers were not authorized to draw or accept these particular bills, that is a matter between themselves and the company, but cannot prejudice innocent third parties. *Booth* v. *Farmers' & Mechanics' Bank*, 50 N. York, 400; *Stoney* v. *Am. Life Ins. Co.*, 11 Paige, 635. In this case the president was the principal owner of the corporation, and not only did, but was allowed by the company to do as he pleased, so that what he did the company did. A similar case is described in *N. York & N. Haven R. R. Co.* v. *Schuyler*, 34 N. York, 30, where the result was that the corporation was held liable, and estopped from disputing the authority of its transfer agent Schuyler. At page 50 the judge quotes the following: "If the directors of a company, no matter whether through inattention or otherwise, suffer its subordinate officers to pursue a particular line of conduct for a considerable period without objection, they are as much bound to those who are

not aware of any want of authority as if the requisite power had been directly conferred." That is just this case, if the acts of the president and treasurer were in excess of their powers. They had been given the control of the books, papers and seal of the corporation, and allowed to manage and control matters as they pleased. The treasurer had, for years, accepted for the company bills drawn by the president on the company for his own private purposes, and the company had regularly paid the bills as they matured, so that within the cases above cited the corporation became bound, whether they had expressly conferred such power or not, or whether the act of accepting was or was not an excess of power. See also *Beers* v. *Phœnix Glass Co.*, 14 Barb., 358; *Lester* v. *Webb*, 1 Allen, 36. It should be remembered that the president and the treasurer owned over 39,900 of the 40,000 shares of the company's stock.

3. The plaintiff is a *bonâ fide* holder of the drafts or bills, and the fact that the plaintiff indorsed and negotiated or sold the drafts before acceptance does not deprive it of the character of a *bonâ fide* holder as against the acceptor. *Heuertematte* v. *Morris*, 101 N. York, 63; *Arpin* v. *Owens*, 140 Mass., 144; *Winne* v. *Raikes*, 5 East, 514; *Powell* v. *Monnier*, 1 Atk., 611; *Robinson* v. *Reynolds*, 2 Queen's Bench, 211; *Hoffman* v. *Bank of Milwaukee*, 12 Wallace, 181; *Mechanics' Bank* v. *Livingston*, 33 Barb., 458; *First Nat. Bank of Portland* v. *Schuyler*, 39 N. York Superior Ct. R., (7 Jones & Spencer,) 440; Byles on Bills, (6 Am. ed.,) 206; 1 Parsons on Notes & Bills, 179, 180. Of the case of *Farmers' & Mechanics' Bank* v. *Empire Stone Dressing Co.*, 5 Bosworth, 275, so much relied upon by the defendant's counsel, it is sufficient to say that that case is contrary to the decisions of every other court on that question, is disregarded now in the very court in which it was rendered, and is expressly overruled by the Court of Appeals in the above case of *Heuertematte* v. *Morris*, 101 N. York, 63.

4. The plaintiff did not purchase the drafts nor advance money on them, but as agent or broker sold them for Stockwell. Having indorsed them the plaintiff afterwards, on

being charged as indorser, was obliged to pay and take them up from Montague & Co., the indorsees and owners, and thus acquiring their title and rights became indisputably *bonâ fide* holders. 1 Parsons on Notes & Bills, 261. The defendant's counsel rely on the case of *Devlin* v. *Brady*, 32 Barb., 518, and 36 N. York, 531, and similar cases. But those are cases where the owner of a note pledges or indorses it to a bank to secure a loan, and afterwards repays the loan and takes back the note. In this case the plaintiff only borrowed the money for the drawer; the drafts were indorsed and sold, and the buyers became the absolute owners. Consequently, when the plaintiff, being charged as indorser, paid the amount of the drafts and took them up, it became a *bonâ fide* holder of the same.

5. It is said that the plaintiff had notice that these drafts were not drawn in the business of the company. Within the foregoing decisions, and in view of the fact that the corporation authorized and allowed its president to draw upon the company and to pledge its credit, and also authorized its treasurer to accept such drafts, and knew of their acceptance, and paid them without objection, it is insisted that it would not make any difference, or relieve the company from liability, if it was, or had been, known to the plaintiff what the drafts were drawn for. What the committee finds is that J. Hume Webster knew that Stockwell was speculating in stocks, and knew what use he put this money to after he got it. Even if J. Hume Webster did have notice, he is not the plaintiff, but at the most an agent, whose knowledge is not the knowledge of the company unless obtained while engaged officially in the business of the company, or rather while engaged in this particular business. *Bank of United States* v. *Davis*, 2 Hill, 451; *N. York Central Ins. Co.* v. *National Protection Ins. Co.*, 20 Barb., 468; *Westfield Bank* v. *Cornen*, 37 N. York, 320; *Atlantic State Bank* v. *Savery*, 82 id., 291; *Washington Bank* v. *Lewis*, 22 Pick., 24; *Commercial Bank* v. *Cunningham*, 24 id., 270. Therefore, while it is not material, and would not be a defense to the defendant, if it had been known what use or purpose the drafts

or their proceeds were to be put to, yet in fact it was not known, or at least it was not proved to have been known, what use they were to be put to, and the burden of proof in such case is on the defendant. 1 Parsons on Notes & Bills, 165, 225; *Safford* v. *Wyckoff*, 4 Hill, 442; *Belmont* v. *Coleman*, 1 Bosw., 188; *Caryl* v. *McElrath*, 3 Sandf., S. C., 176. Besides, if the position taken in the preceding fourth point is correct, that the plaintiff got the rights of Montague & Co., it would make no difference whether it knew that the acceptance was an accommodation acceptance or an excess of power, or not. The plaintiff, deriving title from a *bonâ fide* holder, would also be a *bonâ fide* holder. Story on Prom. Notes, § 191.

6. Supposing the plaintiff and all the parties knew at the time of the indorsement and negotiation of the bills that the drawer intended to use the money for his own purposes, could such knowledge prejudice the plaintiff and deprive it of the rights of a *bonâ fide* holder? How could the plaintiff know that the drawer did not have funds in the hands of the drawee, or that the drawee did not owe him? The law would presume that he was drawing against funds, or that the drawee was indebted to him, and the defendant admitted it by the acceptance. Chitty on Bills, 580, 647; *Alvord* v. *Baker*, 9 Wend., 323; *People's Bank* v. *Bogart*, 81 N. York, 106; *Raborg* v. *Peyton*, 2 Wheaton, 385. The case stands precisely as if it had been known to the plaintiff at the time of the indorsement and negotiation or sale of the drafts that the acceptor was indebted to the drawer and that the drafts were drawn against funds. In fact it was so proven, the presumptions standing alone being equivalent to proof.

7. It may be said that there were circumstances sufficient to put the plaintiff upon inquiry as to whether the drawing and acceptance of the bills were authorized. Apart from this fact it is well settled law that a party, before taking commercial paper, is never bound to make inquiry, and that no amount of negligence will prejudice his rights or deprive him of the character of a *bonâ fide* holder. *Welch* v. *Sage*,

47 N. York, 143; *Seybel* v. *National Currency Bank*, 54 id., 288; *Chapman* v. *Rose*, 56 id., 137, 140; *S. C.*, 47 How. Pr. R., 15. The plaintiff however was not negligent in this case. It not only had no reason to question or suspect a want of authority, but there was in fact none.

*W. D. Shipman* and *M. H. Cardozo*, both of New York, with whom were *S. G. Wheeler, Jr.*, of New York, and *G. Stoddard*, for the defendant.

1. The law of the state of New York must govern as to the liability of the defendant upon the acceptances of the drafts in suit, for they were both accepted and payable in the city of New York. Daniel on Negotiable Inst., §§ 895, 896, 879; *Everett* v. *Vendryes*, 19 N. York, 436; *Hibernia Nat. Bank* v. *Lacombe*, 84 id., 367, 381; *Dickinson* v. *Edwards*, 77 N. York, 573, 576, 587; *Musson* v. *Lake*, 4 How., 262; *Rouquette* v. *Overman*, L. R., 10 Q. B., 525.

2. The powers of a corporation created by a legislative act are such only as the statute creating it confers, and the enumeration of such powers implies the exclusion of all others. The defendant was incorporated in 1871 by an act of the General Assembly of the state of Connecticut. By the second section of the act it is provided that the defendant is to have power to " manufacture sewing machines, machinery and tools of all kinds, metallic castings, forgings, lumber, cases, and any and all other articles and things composed in whole or in part of metal or wood which they shall deem expedient, and conduct such mercantile business as may be convenient in connection with such manufacture." When the defendant accepted this charter, there was created a contract between the state of Connecticut on the one part and the defendant on the other, binding alike upon both, and by its terms the defendant could do no other business than that which under this contract the state gave it power to do. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence. MARSHALL, Ch. J., *Dartmouth College* v. *Wood-*

*ward*, 4 Wheaton, 536. Being a manufacturing corporation of course it impliedly had authority to do such acts as were proper or usual in carrying on such a business; thus it had no express power to sell what it manufactured, but such power would be necessarily implied; again, it had no express power to make negotiable paper, but impliedly for the purposes of carrying on its legitimate business such power clearly existed. But no where in its charter is any express power conferred upon it to engage in speculations in stocks. It had no such express power, and there are no words in the charter from which such a power can be implied. A learned writer well states the argument against a recognition of *ultra vires* acts as valid, for, says he, it " would be against public policy, for the reason that the assets and income of the corporation might be expended in unauthorized undertakings and speculations, and the corporation thereby prevented from performing its part of the contract with the state; and because the non-assenting stockholders and creditors of the corporation might thereby suffer loss, against which they should be protected." George W. Field on " *Ultra Vires*," 13 Am. Law Review, 632. The English Courts maintain the doctrine that charters not expressly or by necessary implication authorizing an act, prohibit it and render such act void. *Ashbury Railway Carriage & Iron Co.* v. *Riche*, L. R., 7 H. L., 653; *S. C.*, L. R., 9 Exch., 224; *East Anglean Railways Co.* v. *Eastern Counties Railway Co.*, 11 Com. Bench, 775; *Coleman* v. *Eastern Counties Railway Co.*, 10 Beav., 11; *Bagshaw* v. *Eastern Union Railway Co.*, 2 McN. & Gordon, 389; *Great Northern Railway Co.* v. *Eastern Counties Railway Co.*, 9 Hare, 306; *McGregor* v. *Dover & Deal Railway Co.*, 18 Queen's Bench, 618; *Eastern Counties Railway Co.* v. *Hawkes*, 5 H. L. Cas., 331; *Attorney Gen.* v. *Great Northern Railway Co.*, 26 Jurist, 1006; *Mayor &c. of Norwich* v. *Norfolk Railway Co.*, 4 El. & Blackb., 397. The same doctrine is laid down in the New York cases. *Safford* v. *Wyckoff*, 1 Hill, 11; *Leavitt* v. *Palmer*, 3 Const., 19; *Talmage* v. *Pell*, 3 Seld., 328; *Tracy* v. *Talmage*, 14 N.

York, 162, 179; *Bissell* v. *Michigan Southern R. R. Co.*, 22 id., 258, 289; *Whitney Arms Co.* v. *Barlow*, 63 id., 62, 68; *Alexander* v. *Cauldwell*, 83 id., 480, 485; *Nassau Bank* v. *Jones*, 95 id., 115, 122. The Connecticut cases are also to the same effect. *N. York Fireman Ins. Co.* v. *Ely*, 5 Conn., 560, 572; *Hood* v. *N. York & N. Haven R. R. Co.*, 22 id., 502; *Elmore* v. *Naugatuck R. R. Co.*, 23 id., 457; *Mutual Savings Bank* v. *Meriden Agency Co.*, 24 id., 159; *Naugatuck R. R. Co.* v. *Waterbury Button Co.*, id., 468. The same doctrine is held in Massachusetts. *Davis* v. *Old Colony R. R. Co.*, 131 Mass., 258. And by the Supreme Court of the United States. *Thomas* v. *Railroad Co.*, 101 U. S. Reps., 71, 82.

3. No stockholder, however large, in a corporation has a right to use the corporate funds or credit for his own purposes. Neither has the board of directors, as a body, the right to use the corporate funds or credit, except for legitimate corporate purposes. But the charter of the Howe Machine Company is imperative on this point, that the capital stock shall not be used by individual stockholders. Morawetz on Corp. §§ 52, 403; *Morgan* v. *Railroad Co.*, 1 Wood's C. C. R., 18; *Kean* v. *Johnson*, 9 N. Jer. Eq., 407; *Black* v. *Del. & Raritan Canal Co.*, 24 id., 455; *Sawyer* v. *Hoag*, 17 Wall., 610; *Upton* v. *Tribilcock*, 91 U. S. Reps., 45, *Patterson* v. *Lynde*, 106 id., 519, 521; *Miner* v. *Mechanic's Bank*, 1 Peters, 71; *Market St. Bank* v. *Stumpe*, 2 Misso. App., 545; *Salem Bank* v. *Gloucester Bank*, 17 Mass., 30; *St. James's Church* v. *Church of Redeemer*, 45 Barb., 356; *Crandall* v. *Lincoln*, 52 Conn., 73, 94; *Pickering* v. *Stephenson*, L. R., 14 Eq. Cas., 340; Thompson on Liability of Officers of Corporations, 398, and notes 1 and 2.

4. When the drafts in suit were given to the plaintiff and accepted by the defendant's treasurer, whatever the defendant might theretofore have been, it was then no " pocket corporation " or quasi partnership. 1 Lindley on Part., 253, 281, 329, 330, 334; *Shirreff* v. *Wilkes*, 1 East, 48; *Farmers' & Mechanics' Bank* v. *Butchers' & Drovers' Bank*,

16 N. York, 135 ; *Monument Nat. Bank* v. *Globe Works*, 101 Mass., 58.

5. The acceptances in question were, as between the plaintiff and defendant, all accommodation acceptances. The defendant's treasurer accepted them solely for the personal accommodation of A. B. Stockwell. There is no finding that the corporation defendant ever had any legitimate business dealings with the defendant. Indeed, no one ever claimed that it had. It is true that the plaintiff introduced evidence to show that there is a custom in the city of London to discount such bills before acceptance, but such evidence was wholly inadmissible and must be disregarded. . It is settled law that if a bill of exchange is discounted before acceptance it is upon the credit of the drawer, and if after acceptance it is upon the credit of the acceptor. The object of the evidence introduced was to vary the law merchant, and to import into the contract or engagement of the acceptor a new, different and additional liability from that which the law imposed upon him ; and that is, that although the plaintiffs discounted the drafts before acceptance, and hence, as the law says, upon the credit of the drawer, they in fact, by virtue of the custom of the city of London, relied upon the acceptors. This custom cannot bind the defendant. *Woodruff* v. *Merchants' Bank*, 25 Wend., 673 ; *S. C.*, 6 Hill, 174 ; *Bowen* v. *Newell*, 4 Seld., 190 ; *Thompson* v. *Riggs*, 5 Wall., 663, 679 ; *Barnard* v. *Kellogg*, 10 id., 383 ; *Stagg* v. *Insurance Co.*, id., 589 ; *Tilley* v. *County of Cook*, 103 U. S. Reps., 155 ; *Wheeler* v. *Newbould*, 16 N. York, 392 ; *Markham* v. *Jaudon*, 41 id., 235, 245 ; 6 Southern Law Review, 845 ; 7 id., 1.

6. The knowledge which J. Hume Webster acquired as a member of the firm of Hume Webster & Co., as to the object for and the agreement upon which A. B. Stockwell gave the drafts in suit, was the knowledge of the Credit Company. Webster was one of the partners in the firm of Hume Webster & Co., and at the same time he was managing director of the Credit Company. What he knew as partner he was not ignorant of as manager of the Credit Com-

pany. In *Nat. Security Bank* v. *Cushman*, 121 Mass., 490, MORTON, J., says :—" If the note is discounted by a bank, the mere fact that one of the directors knew the fraud or illegality will not prevent the bank from recovering. But if the director who has such knowledge acts for the bank in discounting the note, his act is the act of the bank, and the bank is affected with his knowledge. A bank or other corporation can act only through its officers or other agents. And in other cases of agency, notice to the agent in the course of the transaction in which he is acting for his principal, of facts affecting the nature and character of the transaction, is constructive notice to the principal. If, therefore, Coleman acted for the bank in discounting the note in suit, the bank is affected with his knowledge of fraud in the inception of the note." See also *Bank of U. States* v. *Davis*, 2 Hill, 451, 463 ; *Innerarity* v. *Merchants' Bank*, 139 Mass., 332. In brief, the clear, simple rule is, that a corporation is bound by the knowledge of the agency through which it acts, be it board of directors, president, managing director, or by whatever name its agent may be known. In this case the plaintiff knew that the drafts in suit were accommodation drafts drawn by A. B. Stockwell for his own benefit and that the entire proceeds were to be, and as in fact they were, paid to Hume Webster & Co. on account of existing balances due them from Stockwell on previous stock losses. The plaintiff also knew that the defendant received no use or benefit, and was not to, and could not, receive any use or benefit from the drafts in suit, or of any money pretended to be paid for the drafts. The articles of association of the plaintiff expressly confer upon its directors all the powers that the corporation may exercise, and, among others, the power to appoint " a manager or managing director."

7. The plaintiff as payee and prior indorser to Montague & Co. did not, by paying to them the amount of the drafts in suit, become subrogated to their rights. The plaintiff did not purchase the drafts of Montague & Co. It merely took them up as indorsers. This gave them no rights as purchasers. *Devlin* v. *Brady*, 36 N. York, 531, affirming the

same case in 32 Barb., 518; *Burr* v. *Smith*, 21 id., 262; *Chester* v. *Dorr*, 41 N. York, 279; *Lancey* v. *Clark*, 64 id., 209, 211.

8. There has been no ratification by the Howe Machine Company of any of the irregular acts of A. B. Stockwell or of Levi S. Stockwell. But even if there had been a ratification by the directors of previous irregular acts, such ratification cannot legalize these acts. " Even a subsequent ratification by the directors of similar transactions will not render other contracts valid." *McCullough* v. *Moss*, 5 Denio, 567.

9. The provision contained in the third section of the defendant's charter, that " said corporation shall, at all times, have a lien upon the stock and property of its members invested therein, for all debts due from them to said corporation," is the same as that contained in the general act relating to the incorporation of joint stock companies in Connecticut, and does not authorize the loaning of its credit by the corporation to its stockholders upon the security of their stock. If it did it would be making the capital stock simply a fund for the payment of such debts as stockholders might impose upon it for their own benefit. *Wood* v. *Dummer*, 3 Mason, 308; *Crandall* v. *Lincoln*, 52 Conn., 73.

10. The plaintiff is not a *bonâ fide* holder of the drafts in suit. The defendant is therefore not estopped from setting up its defense, that there has been no valid acceptance of these drafts by the Howe Machine Company. The sole power of the treasurer to accept is given by the directors' resolution, " that the treasurer be, and he hereby is, authorized and empowered to make, sign, indorse and accept notes, checks and bills of exchange in the name and for and on account of this company, and generally to execute any and all papers relating to the business of the company." But not only had the treasurer no authority conferred on him by the directors to accept accommodation drafts, the directors themselves had no power to confer any such authority. Article thirteen of the by-laws in express terms restrains them from conferring any such power. It is as

follows:—" No officer or agent of this corporation shall be allowed or have any right or power to sign, indorse or pledge the name or credit of the corporation, or to use, pledge or dispose of the property or funds of the corporation, except for its sole use and benefit." One who deals with the officers or agents of a corporation is bound to know their powers and the extent of their authority. Daniel on Neg. Inst., §§ 386, 889 ; Green's Brice's Ultra Vires (2d ed.) 252, note *a ; Stainer* v. *Tysen,* 3 Hill, 279 ; *Farmers' & Mechanics' Bank* v. *Butchers' & Drovers' Bank,* 16 N. York, 135 ; *Alexander* v. *Cauldwell,* 83 id., 480. It is clear here that this acceptance was in no manner for the benefit of the company, as it was accommodation paper. But even of this paper the plaintiff is not a *bonâ fide* holder because it was taken for a pre-existing debt. The drafts were drawn by A. B. Stockwell, and, for a commission paid by him, indorsed by the Credit Company, J. Hume Webster director; their discount procured by the Credit Company, J. Hume Webster director ; and the proceeds paid to J. Hume Webster, stock broker, on account of a pre-existing debt of over £30,000 due from Stockwell to Hume Webster, for losses in stock speculations. In these circumstances the plaintiff stands in the same position with Hume Webster himself. Where paper is thus applied to a pre-existing debt of the party taking it he cannot be regarded as a *bonâ fide* holder for value. *Philbrick* v. *Dallett,* 34 N. Y. Superior Court R., 370 ; *Clark* v. *Ely,* 2 Sandf. Ch., 166 ; *Chrysler* v. *Renois,* 43 N. York, 212 ; *Comstock* v. *Hier,* 73 id., 269 ; *Heuertematte* v. *Morris,* 101 id., 63. The drafts were taken with full knowledge that they were accommodation drafts. The finding of the committee is clear and conclusive upon this point. And no consideration was advanced on the faith of the acceptance. " To entitle one to enforce an indorsement or an acceptance, which is otherwise invalid, on the ground that he is a *bonâ fide* holder for value, it must appear that he parted with value upon the faith of the acceptance. He may be a *bonâ fide* holder of the bill for value paid therefor, and be entitled to enforce it against every other party

thereto, and yet have no right to recover on such indorsement or acceptance." *Farmers' & Mechanics' Bank* v. *Empire Stone Dressing Co.*, 5 Bosw., 275.   See also Daniel Neg. Inst., § 449 ; *Philbrick* v. *Dallett, supra ; Chrysler* v. *Renois, supra ; Monument Nat. Bank* v. *Globe Works*, 101 Mass., 59 ; *Fawcett* v. *New Haven Organ Co.*, 47 Conn., 224. As to the defendant not being estopped from setting up the invalidity of the acceptance—Bigelow on Estoppel, 345, 437.

11. The defendant was a manufacturing corporation and had no power, express or implied, to engage in stock speculations.   The second section of its charter shows clearly that it was a manufacturing corporation with power only to conduct such mercantile business as might be convenient, in connection with the manufacture of sewing machines, etc.   It is well settled that so far as the authority of an agent of a corporation is defined by the constitution or charter, the scope of the agent's powers must always be considered as disclosed.   Hence, when the charter discloses that the corporation had not the power, *ex necessitate,* it must be held to have disclosed that the agent of the corporation had not and could not have the power.   *Silliman* v. *Fredericksburg, &c. R. R. Co.*, 27 Gratt., 119, 130 ; *Pearce* v. *Madison, &c. R. R. Co.*, 21 How., 443 ; *Merritt* v. *Lambert*, 1 Hoff. Ch., 166, 168 ; *Hoyt* v. *Thompson's Exr.*, 19 N. York, 207 ; *Salem Bank* v. *Gloucester Bank*, 17 Mass., 1, 29 ; *Root* v. *Wallace*, 4 McLean, 8 ; *Bank of Chillicothe* v. *Dodge*, 8 Barb., 233 ; *City Fire Ins. Co.* v. *Carrugi*, 41 Geo., 660, 673 ; *Underwood* v. *Newport Lyceum*, 5 B. Monr., 129 ; *Balfour* v. *Ernest*, 5 C. B., N. S., 601.

12. It cannot be seriously contended that a fraudulent or irregular use of the funds or credit of a corporation becomes sanctioned and legalized by repetition, or that one who has been a party to the earlier frauds or irregularities with full knowledge, becomes thereby an innocent party in later and similar transactions.   A collusive holder can not be an innocent holder.

CARPENTER, J. (After stating the facts.) As this case was commenced before the practice act went into operation the pleadings are under the old practice. The defendant denies the matters alleged in the declaration, and gives notice, in substance, that it will prove that the treasurer of the defendant corporation was not authorized to accept these drafts, that the drafts being solely for the accommodation of the drawer the company itself under its charter and by-laws had no power to accept them, and that the plaintiff is not a *bonâ fide* holder for value.

The defendant's notice alleges that these bills were not accepted by the defendant, or by or with its authority or consent, but were accepted by one of its officers without authority and contrary to the provisions of its by-laws, of which the plaintiff had notice.

It is not contended that the treasurer had no power under any circumstances to accept any draft; for the votes of the directors and the course of dealing by the defendant clearly show that he had such power; but it is claimed that under the circumstances he had no power to accept these particular drafts. Obviously the authority or want of authority in the treasurer to accept these drafts depended not upon the nature of the act but upon the attending facts and circumstances. That he had power to accept drafts under some circumstances is not denied. Hence, if they were drawn on account of the defendant's business, or to draw out of its treasury money which belonged to A. B. Stockwell, the power of the treasurer to accept them would be conceded. But the strength of the defendant's position in this part of the case lies in the fact that the defendant was not owing Stockwell, and the money was not wanted for any purpose connected with the defendant's business. As between the Stockwells, or either of them, and the defendant, the acceptances were unauthorized and void; but, as between the plaintiff and the defendant, the answer to the question we are considering hinges upon the answer to another question,—is the plaintiff a *bonâ fide* holder for value?

The proper answer to that question we shall consider later; but assuming for the present that the answer may be an affirmative one, we pass to the next question, which is,—was the defendant authorized to accept accommodation drafts? Clearly not as to all parties with notice. But as corporations may accept drafts for some purposes, and as the purpose for which a draft is drawn does not ordinarily appear on its face, the question as to all parties with notice is—was it drawn for a legitimate purpose? As to all others the important inquiry is,—is the plaintiff a *bonâ fide* holder for value? And that brings us to the main question in the case.

A preliminary question of some importance which bears directly on this question is—on whom was the burden of proof? In the pleadings the defendant assumes that burden; and properly so upon principle. The drafts apparently may be for a legitimate purpose. As there is some presumption that all parties act properly and within the scope of their powers, the plaintiff establishes a *primâ facie* case when it presents the drafts duly drawn and accepted, there being no circumstances indicating fraud or illegality. And so are the authorities. Edwards on Bills, 686, 689; Daniel on Negotiable Instruments, 626, 662; 1 Parsons on Notes & Bills, 255.

It is insisted that the plaintiff does not sustain to this defendant the relation of a *bonâ fide* holder for value, for the reason that the drafts were indorsed and negotiated by the plaintiff before they were accepted; and that therefore the plaintiff parted with nothing of value upon the credit of the acceptances. In support of this position the case of *Farmers' & Mechanics' Bank* v. *Empire Stone Dressing Co.*, 5 Bosworth, 275, is cited. We are unable to accept that decision as a correct exposition of the law. The Court of Appeals says of that case, in the case of *Heuertematte* v. *Morris*, 101 N. York, 63:—"It is true that some expressions of the learned judge writing in that case may justify the citation, yet it should be considered that those remarks were unnecessary to the decision of the case, and the same court

have twice since then refused to follow it. We conceive the rule there laid down finds no support in the doctrines of the text writers or the reported cases. * * * If a party becomes a *bonâ fide* holder for value of a bill before its acceptance, it is not essential to his right to enforce it against a subsequent acceptor, that an additional consideration should proceed from him to the drawee. The bill itself implies a representation by the drawer that the drawee is already in receipt of funds to pay, and his contract is that the drawee shall accept and pay according to the terms of the draft. The drawee can of course upon presentment refuse to accept a bill, and in that event the only recourse of the holder is against the prior parties thereto; but in case the drawee does accept a bill, he becomes primarily liable for its payment, not only to its indorsees but also to the drawer himself."

It is not therefore true that the purchaser of a bill before acceptance trusts wholly to the credit of the drawer. He believes and expects that the drawee will accept; and upon such belief and expectation he acts. When Stockwell presented these bills to the plaintiff, he contracted that the drawee would accept and pay them. Upon that promise the plaintiff relied.

The reply to *Heuertematte* v. *Morris* is, that in that case the acceptor was an individual and not a corporation; so that no question arose as to the validity of the acceptance. But the validity of the acceptance is not the question we are now considering. We have already endeavored to show that the acceptance in the case at bar bound the corporation as to a *bonâ fide* holder for value. The precise question now is—whether a person who receives an accommodation bill before acceptance, no new consideration moving from him to the drawee, can avail himself of a subsequent acceptance. In *Farmers' & Mechanics' Bank* v. *Empire Stone Dressing Co.*, 5 Bosworth, 275, it was held that he could not. In *Heuertematte* v. *Morris*, 101 N. York, 63, it was held that he could. The latter case was put upon the broad ground that the former was not law; and not upon any supposed dis-

tinction between corporations and individuals. The good faith of the holder must not be confounded with the validity of the acceptance. Although the latter may and often does depend upon the former, yet they are distinct questions for most purposes. An accommodation acceptance being valid, and the plaintiff otherwise a holder in good faith, the mere fact that he received the bill before acceptance does not make him a *malâ fide* holder.

In *Arpin* v. *Owen*, 140 Mass., 144, the court say:—" It is immaterial when an acceptance is made ; it may be made at any time, and the rights of the payee and of the indorsee are the same after it is made, whether they were acquired in anticipation of it or subsequent to it."

These drafts were indorsed and sold by the plaintiff, and the avails were paid over to A. B. Stockwell. Stockwell paid the money so received to Hume Webster & Co. So far the transaction on its face is free from suspicion. It is not claimed that any fraud or illegality is found in terms. The most that can be claimed is, that there are certain circumstances in the case from which fraud may be inferred. Those circumstances are that Stockwell had been previously speculating in stocks with the knowledge of Webster ; that in doing so he had become largely indebted to Hume Webster & Co., a firm in which J. Hume Webster was a partner ; that J. Hume Webster was the agent by whom the plaintiff indorsed and sold these drafts ; and that the money received therefor was in a short time paid over to Hume Webster & Co. in part liquidation of Stockwell's indebtedness to that firm.

But these circumstances are not, in law, equivalent to fraud. At one time in England the question was held to be whether the plaintiff had taken the bill under circumstances which ought to have excited the suspicion of a prudent and careful man. *Gill* v. *Cubitt*, 3 Barn. & Cress., 466. Afterwards the rule was so far modified as to require gross negligence. *Crook* v. *Jadis*, 5 Barn. & Adol., 909. Later still gross negligence was held to be evidence of *mala fides* merely, and not the thing itself. In *Goodman* v. *Harvey*, 4 Adol. &

El., 870, Lord DENMAN says:—" I believe we are all of opinion that gross negligence only would not be a sufficient answer where the party has given consideration for the bill. Gross negligence may be evidence of *mala fides*, but is not the same thing. We have shaken off the last remnant of a contrary doctrine."

In *Swift* v. *Tyson*, 16 Peters, 1, STORY, J., says:—" There is no doubt that a *bonâ fide* holder of a negotiable instrument for a valuable consideration, without any notice of facts which impeach its validity as between the antecedent parties, if he takes it under an indorsement made before the same becomes due, holds the title unaffected by those facts, and may recover thereon, although as between the antecedent parties the transaction may be without any legal validity." " Notice of facts which impeach its validity " means knowledge of those facts. *Goodman* v. *Simonds*, 20 Howard, 343 ; and by " facts " is intended facts which of themselves impeach the transaction,—in this case fraud, and not other facts which tend to prove fraud or which excite suspicion. *Goodman* v. *Simonds, supra*. And such is the law of this state. *Brush* v. *Scribner*, 11 Conn., 388. We think that is the law of this country ; at least we are aware of no contrary decision.

" But it must still be true," as is said in 1 Parsons on Notes & Bills, 259, " that while gross or even the grossest negligence is a different thing from fraud, the negligence may be such, and so accompanied, as to afford reasonable and sufficient grounds for believing that it was intentional and fraudulent." By this we apprehend that no more is meant than that the evidence may be so strong as to justify the court in finding fraud ; and applies only to courts that pass upon both questions of fact and law, and has no application to this court, which must take the facts as they are found by the court below.

It may be further claimed that the fraud here contended for is not the fraud of antecedent parties to the bills, but fraud, if it exists, to which the plaintiff itself is a party ; and that if the facts and circumstances establish fraud with

reasonable certainty, the court ought so to regard it, notwithstanding the fact that fraud is not expressly found. We apprehend that the proposition does not relieve the case of the objection that the question is still one of fact and not of law. Nevertheless, assuming that the principle involved in the proposition is a correct one, we will briefly examine the facts to see if it has any application to this case. To make the principle applicable we think the facts should be of a conclusive character. If they are ambiguous, or consistent with the absence of fraud, they are not sufficient.

There are certain facts essential to the conclusive character of this evidence, which are wanting; and their absence is significant. It is not found that Webster knew that Stockwell had no funds in the defendant's treasury against which these drafts were drawn. If Stockwell had in fact had funds there, that would have effectually repelled any imputation of fraud. Webster's knowledge of the purpose of the drafts, a previous agreement even with Stockwell that the avails should be paid to Hume Webster & Co., would have been of no consequence. So also if he really believed that the bills were drawn against funds. That he did so believe is probable, as certain undisputed facts afford a reasonably good foundation for such a belief. For about three years Webster had known and had business dealings with Stockwell. Within a period of four months immediately preceding this transaction the plaintiff indorsed and negotiated drafts by Stockwell on the defendant for $75,000. Two days after the drafts in suit were negotiated, it indorsed and negotiated drafts by and on the same parties for $30,000 more. All these drafts were in fact accepted by the defendant and paid at maturity.

In December, 1876, when Stockwell presented to the plaintiff drafts to the amount of $45,000, he in legal effect represented that he had funds in the defendant's hands; he virtually pledged his honor and reputation as a business man that it was true. When the defendant accepted those drafts it admitted that those representations were true. The same representations were repeated by the parties in Febru-

ary, 1877, and on March 28th. All those representations were, for all the purpose of this case, true; for those drafts were all paid at maturity. Is it strange that the same representations made on the 26th day of March should be believed?

It is not found that Webster knew that the drafts were drawn for the purpose of raising money to pay to Hume Webster & Co. If he had not such knowledge how could he be justly chargeable with a fraudulent intent?

Again. There is no finding that Stockwell was then in poor credit, or that Webster or Hume Webster & Co. supposed that they were in danger of losing by him. Hume Webster & Co. had, in the space of about one month, paid his checks to an amount exceeding $100,000. The plaintiff, during the same month, indorsed his drafts to the amount of $75,000. These facts afford some ground for believing that both parties regarded him as trustworthy. If they did, pray what reason had they for colluding with Stockwell for the purpose of drawing money illegally and unjustly from the defendant?

Moreover, the circumstances relied on as showing fraud are in themselves weak and will hardly justify, much less require, the inference claimed for them.

We may add that if bills of exchange, which are supposed to be the highest type of negotiable instruments, can be successfully impeached by such circumstances as exist in this case, the integrity of all such instruments must be seriously impaired, and their usefulness as a circulating medium well nigh destroyed.

In the next place, it is claimed that the plaintiff is not a *bonâ fide* holder because the defendant's treasurer had no power to accept accommodation drafts, that the corporation itself had no such power, and that the plaintiff was bound to take notice of the powers of a corporation and its officers, and of the extent of their authority.

On account of the complex character of this proposition it can only be properly considered by treating each branch of it separately. We may admit generally that the treas-

urer had no authority to accept accommodation paper, and that the directors had no power to confer upon him such an authority. But in order to prevent injustice and maintain the integrity of mercantile paper it is necessary to limit the application of the principle to parties with notice. This limitation necessarily results from the fact that every business corporation has power to deal in negotiable paper in the line of its business. As such paper does not ordinarily show on its face the circumstances of its origin or the pur- pose for which it is made, it becomes important to distin- guish those who have notice of its character and purpose from those who have not. To say indiscriminately that the holder of accommodation paper made by a corporation can- not be a *bond fide* holder simply because it is accommoda- tion paper, ignores this important distinction and amounts practically to begging the question.

We pass now to the second branch of the proposition— that persons dealing in commercial paper of a corporation are bound to take notice of the extent of its power. Here too we may properly admit that the proposition is a correct one ; but care should be exercised in its application not to extend it beyond its appropriate limits. To clearly under- stand those limits a distinction is to be observed between the terms of a power and the circumstances under which it is exercised. Parties may well be required to take notice of the former; but to require them to have knowledge of the latter would in many cases result in gross injustice. Especially is this so where the agent or officer of the cor- poration which exercises the power, at the same time repre- sents the corporation, and speaks for it in giving informa- tion as to the circumstances under which it is exercised. No better illustration is needed than the case at bar. The treasurer of the defendant was the officer specially author- ized by vote of the directors to accept bills of exchange ; at the same time by virtue of his office, he was the person held out by the corporation as the proper one to inform holders whether the drawer draws against funds. The corporation virtually says—" you may safely trust the word of our

treasurer on that subject." When he speaks, the corpora-
tion speaks. By accepting the draft he declares that the
drawer has funds, and that is the declaration of the corpor-
ation. Mercantile paper does not require those who would
become its holders to go to the acceptor and insult him by
the question—did you tell the truth when you accepted
that paper? They have a right to assume that he tells the
truth and to act accordingly. If the treasurer in fact mis-
represents the corporation, the corporation and not the per-
son who trusts him should bear the loss.

An instructive and very interesting case on this subject
is *The Farmers' & Mechanics' Bank* v. *The Butchers' & Dro-
vers' Bank*, 16 N. York, 125. The defendant's counsel cite
that case and quote from it this sentence—" One who deals
with an agent has no right to confide in the representation
of the agent as to the extent of his powers." The court
however clearly recognise the distinction to which we have
adverted,—namely, between the terms of a power, and ex-
trinsic facts, which may or may not, according to the cir-
cumstances, affect the rights of third persons when the
power is exercised. That was an action on a certified
check. The defense was that the bank had no funds of the
drawer. Immediately following the sentence quoted the
court uses this language:—" If therefore a person, knowing
that the bank has no funds of the drawer, should take a
certified check, upon the representation of the cashier or
other officer by whom the certificate was made that he was
authorized to certify without funds, the bank would not be
liable. But in regard to the extrinsic fact, whether the
bank has funds or not, the case is different. That is a fact
of which a stranger, who takes a check certified by the tel-
ler, cannot be supposed to have any means of knowledge.
Were he held bound to ascertain it, the teller would be the
most direct and reliable source of knowledge, and he
already has his written representation upon the face of the
check. If, therefore, one who deals with an agent can be
permitted to rely upon the representation of the agent as
to the existence of a fact, and to hold the principal respon-

sible in case the representation is false, this would seem to be such a case. It is, I think, a sound rule, that where the party dealing with an agent has ascertained that the act of the agent corresponds in every particular, in regard to which such party has or is presumed to have any knowledge, with the terms of the power, he may take the representation of the agent as to any extrinsic fact which rests peculiarly within the knowledge of the agent, and which cannot be ascertained by a comparison of the power with the act done under it."

This case also holds that a certified check is substantially an accepted bill of exchange. The principle involved therefore applies to this case and is an authority against the defendant. It is true that, in the case at bar the bills of exchange were not accepted when the plaintiff indorsed them ; but we apprehend that that will not prevent the application of the principle. It is no uncommon thing for the payee to indorse a bill and put it in circulation before acceptance. The fact that he does so is in itself no evidence of bad faith.

The principle seems to be, that a person dealing with a corporation is bound to know whether or not the officer or agent who represents it and acts in its name is authorized so to do. If he is, and the act is within the apparent scope of his authority, he is not bound to have knowledge of extrinsic facts making it improper for him to act in that case.

We must conclude therefore that the fact that the drawer had no funds in the hands of the drawee at the time these bills were drawn and negotiated, that fact being unknown to the plaintiff, is not a sufficient reason for holding that the plaintiff is not a *bonâ fide* holder.

It is further claimed that the plaintiff is not a *bonâ fide* holder for value on account of the use which was made of the proceeds of these bills, they having been paid to Hume Webster & Co. to apply on a debt due that firm from Stockwell. This argument assumes, what we cannot admit, that the payment was equivalent to a payment to the plaintiff on a debt due it. The firm of Hume Webster & Co. and the

plaintiff are in fact and in law two distinct persons ; and we must so regard them until fraud or collusion is established which will make one responsible for the acts of the other. If the plaintiff was guilty of no fraud, and for reasons already suggested we must assume that it was not, then the plaintiff in good faith paid full value for these bills. If we were at liberty to regard this as a scheme devised by Webster (acting in the name of the plaintiff but really for Hume Webster & Co.) and Stockwell, to defraud the defendant for the benefit of Hume Webster & Co., we might be justified in holding that the plaintiff is not a *bonâ fide* holder. But we cannot reach that result as a legal conclusion from the facts as they appear. The main fact, the one thing essential to that conclusion, an arrangement to that effect then or previously made, is not found.

For these reasons a majority of the court are of the opinion that the plaintiff is entitled to recover, and the Superior Court is so advised.

In this opinion PARDEE, LOOMIS and GRANGER, Js., concurred.

PARK, C. J., (dissenting.) I think the plaintiff corporation is not a *bonâ fide* holder of the drafts in question, for the following reasons :—

The defendant corporation was limited by its charter to such use of mercantile paper as might be necessary in the prosecution of its business. The plaintiff was bound to take notice of this limitation and to conduct itself accordingly. The plaintiff knew, through Hume Webster, its managing director, that the proceeds of these drafts were not to be used by the defendant in the prosecution of its business, but were to be used by the drawer, A. B. Stockwell, for his own individual purposes in London, while engaged in speculating in stocks.

But it is said that corporations as well as individuals are bound to pay their debts ; that if the defendant was owing A. B. Stockwell to an amount equal to the face of these

drafts, the defendant had the right to pay the indebtedness by the acceptance and payment of the drafts, no matter to what purpose the proceeds might be applied.

It is further said that the plaintiff, when it discounted these drafts for A. B. Stockwell at his request, did not know that Stockwell had no funds in the hands of the defendant, and had therefore the right to assume from the act of Stockwell in presenting the drafts for discount, that he had funds in the hands of the defendant sufficient for the payment of the drafts, which presumption was enough to constitute the plaintiff a *bonâ fide* holder of the drafts for value, although Stockwell at the time was owing the defendant a large amount.

I concede that the claims of the plaintiff would be sound if the facts of the case admitted of them.

It will be observed that A. B. Stockwell, when he presented the drafts to the plaintiff for discount, made no declaration, in fact, that he had funds in the hands of the defendant on which they were drawn. I fully concede that if the drawer of a draft presents it to a party for discount, an implication arises that the draft is drawn on funds of the drawer in the hands of the drawee, if nothing whatever is said by the drawer on the subject, and the party to whom the draft is so presented knows nothing to the contrary. And I further concede that such presumption, in such circumstances, would be sufficient to make such party a *bonâ fide* holder of the draft for value, should he discount the paper. But this is only a presumption of law, which must give way to express declarations to the contrary, made by the drawer at the time he presents the draft for discount. The majority of the court treat this presumption of law, in the present case, as equivalent to a positive declaration of Stockwell that he had funds in the hands of the defendant sufficient to pay the drafts, to the truth of which he pledged his honor and credit as a business man. I cannot so regard the matter in the case we have here on paper to determine. Let the finding of the committee decide the matter.

The committee finds on this point as follows :—' In the

spring of 1874 A. B. Stockwell went to London, England. He presented letters of introduction to J. Hume Webster, the managing director of the Credit Company (Limited), and at the same time represented that he was president of the Howe Machine Company; that he was the principal stockholder; that he had the right to pledge the credit of the company, and was their representative in Europe, and that the business was very profitable. The Credit Company, relying on these representations made to its managing director, had the following business transactions with said Stockwell and said Howe Machine Company, the defendant."

Then follows a description of the drafts that were afterwards drawn by A. B. Stockwell on the defendant and discounted by the plaintiff, and among them are the drafts under consideration.

Here it appears that Stockwell, on his arrival in London in 1874, applied to the plaintiff's managing director for a line of discounts by the plaintiff, of drafts to be drawn by him on the defendant, from time to time. In order to induce Mr. Webster, acting for the plaintiff, to make the discounts, he represents that he himself is a person of large property, being the principal stockholder of the defendant company; that the defendant was a rich corporation, doing a very prosperous business; that he had the authority to pledge its credit, and was its representative in Europe. And it is to be presumed that he stated all that could be said to induce Mr. Webster, acting for the plaintiff, to make the discounts, and Mr. Webster must so have understood it. If the drafts were to be drawn on funds of Stockwell, would he not have so stated, when he was making a statement of his case?

It seems that the representations which were made had the desired effect, for the committee finds that the drafts under consideration, as well as all the others, were discounted by the plaintiff relying upon these representations; that is, were made upon the faith of them and in consequence of them. The plaintiff relied upon the ability of Stockwell to render the defendant liable to pay these drafts,

the proceeds of which, the plaintiff knew, were to be used by Stockwell in stock speculations ; which could not be the case without the drafts being accommodation drafts, as they were in fact.   How then can it be said that the plaintiff, in discounting the drafts, was induced to do so by the presumption of law that they were drawn by Stockwell upon funds of his in the hands of the defendant ?   The acts and declarations of Stockwell were equivalent to an express declaration that he pledged the credit of the defendant to accept and pay the drafts at maturity as accommodation paper of his, the plaintiff knowing that the proceeds were to be used by him in stock speculations.   Suppose that the drafts in question were the first that were discounted by the plaintiff for Stockwell, and that when Stockwell asked Mr. Webster for the plaintiff's discount, the following conversation on the subject had occurred.   Mr. Webster inquires : " What do you propose to do with the proceeds of the drafts ? "   To which Mr. Stockwell replies :  " I intend to use them in my stock speculations here in London."   To this Mr. Webster rejoins :  " I see by the charter of the drawee that it is limited to such use of mercantile paper as may be necessary in the prosecution of its business.   What security have we that the drafts will be paid ? "   To this Mr. Stockwell replies : " I am president of the company ; I am its principal stockholder ; I am its representative in Europe ; I have authority to pledge the credit of the company to the payment of the drafts."   Mr. Webster, not satisfied with this, says :  " I see by the by-laws of the company that none of its officers have authority to pledge the company's credit.   How is this ? "   Mr. Stockwell answers : " But I have authority notwithstanding."   Mr. Webster then says :   " Relying upon your declarations, that you are the president of the company on whom the drafts are drawn, that you are its principal stockholder, that you are its representative in Europe, that you have authority to pledge the credit of the company to pay these drafts, we will discount them."

If such dialogue had occurred, and the case finds that it

did so substantially, could it be said that a presumption of law existed in the case in favor of the plaintiff, that the drafts were drawn on funds of Stockwell in the hands of the defendant, and could Webster have supposed that the drafts were drawn on the funds of Stockwell? I think not. I think the declarations of Stockwell gave Webster clearly to understand that the drafts were accommodation paper, and that consequently the plaintiff was not a *bonâ fide* holder of them.

I think judgment should be rendered for the defendant.