LUMBERMEN'S TRUST CO. v. TITLE INS. & INV. CO. OF TACOMA et al.

(Circuit Court of Appeals, Ninth Circuit. January 7, 1918.)

No. 3013.

1. MONOPOLIES ⬅12(2)—WHAT ARE—SUBJECTS OF MONOPOLY.

As the records are open to the inspection of all, the abstract business is not susceptible of being monopolized in same sense that dealing in a commercial product may be monopolized; so a transaction whereby one of several competing abstract companies acquired the business of its competitors is not subject to attack.

2. MONOPOLIES ⬅12(2)—COMBINATIONS IN RESTRAINT OF TRADE—WHAT ARE.

Where one of three corporations doing abstract business in a city acquired the business of one of its competitors and leased the plant of another, such contract, though it tended to suppress previous ruinous competition, was not open to attack under Const. Wash. art. 12, § 22, declaring that monopolies and trusts shall never be allowed, and no in-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

corporated company shall directly or indirectly combine or make any contract with any other incorporated company, through their stockholders or trustees, or in any manner whatsoever, for the purpose of fixing the price or regulating the production of any product or commodity: for, while one of the purposes of the contract and its necessary effect was to suppress competition, it is not subject to attack on that ground, the purchasing and leasing company acquiring the plants of its competitors without any agreement in restraint of trade.

3. MONOPOLIES ⬤➡12(2)—WHAT ARE—SUBJECTS OF MONOPOLY.

In such case, where the corporation organized by the purchasing company to acquire the assets of one of the competing abstract companies found itself unable to meet its obligations, owing to the weakness of the business, and at that time another competing company had already entered the field, a subsequent contract, whereby the terms of the purchase were modified and the purchasing company and its stockholders guaranteed the payment of principal and interest, is not subject to attack as creating a monopoly.

4. MONOPOLIES ⬤➡12(4) — CONTRACTS — COVENANTS NOT TO RE-ENGAGE IN BUSINESS.

Covenant of a corporation, in disposing of its business to another, not to engage in the same business within a certain area and within a reasonable time, is not invalid as tending to create a monopoly.

5. CONTRACTS ⬤➡116(1)—MONOPOLIES—VALIDITY.

Before contracting parties can be absolved from their solemn obligations, on the ground that their contracts are invalid as creating a monopoly, it must be shown that their agreements are manifestly injurious to the public, for public policy is as much concerned in holding persons to their contracts as in prohibiting contracts in restraint of trade.

6. CORPORATIONS ⬤➡484(3)—CONTRACTS OF GUARANTY—VALIDITY.

Const. Wash. art. 12. § 6, entitled "Limitations upon Issuance of Stock," and declaring that corporations shall not issue stock except to bona fide subscribers or their assigns, nor shall any corporation issue any bond or other obligation for the payment of money, except for money or property received or labor done, does not, its obvious purpose being to protect creditors of corporations and prevent the issuance of worthless securities, preclude a corporation, which, through the agency of another, it organized for the purpose of acquiring the business of a competitor, from guaranteeing the principal and interest of the indebtedness incurred by its subsidiary; it appearing that the stock of the nominal purchasing corporation was held by the shareholders of the principal company, and there being a valuable consideration for the guaranty.

7. CORPORATIONS ⬤➡484(3)—STOCKHOLDERS—GUARANTY—VALIDITY.

Where a corporation organized another corporation to acquire the business of a competitor, and the stock of the nominal purchasing corporation was owned by the shareholders of the principal company, a contract by the shareholders of the principal company, guaranteeing the obligations of the subsidiary company on account of the purchase, is valid, notwithstanding Const. Wash. art. 12, § 6, forbids a corporation to issue a bond or any other obligation for the payment of money, except for the money or property received or labor done, for the provision, if for the benefit of stockholders of a corporation, might by them be waived.

8. CHATTEL MORTGAGES ⬤➡104—CONSTRUCTION—NOTES.

While a note and chattel mortgage should be construed together, yet, as the provisions of the note govern in case of a conflict, the holder may, where there had been a long-continued default in payment of interest, exercise the option given in the note and declare the whole of

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the principal and interest due, regardless of the provisions of the mortgage as to defaults.

9. ABATEMENT AND REVIVAL ☞84—ANSWER TO MERITS—PREMATURE ACTION —WAIVER.

The objection that a suit was prematurely brought is waived, where, without presenting the objection in any way to the court below, defendants answered to the merits.

Appeal from the District Court of the United States for the Southern District of Washington; Edward E. Cushman, Judge.

Bill by the Lumbermen's Trust Company, as trustee, against the Title Insurance & Investment Company of Tacoma, a corporation, and others. From a decree dismissing the bill, complainant appeals. Reversed and remanded, with directions.

In the year 1909 there were three incorporated companies engaged in the business of furnishing abstracts of title at Tacoma, Wash.: The Commonwealth Title Trust Company, hereinafter called the Commonwealth Company, owned and controlled by the Foggs and Gove; the Title Insurance & Investment Company, of Washington, hereinafter called the Washington Company, owned and controlled by Willoughby and Smith; and the Wilson Title & Abstract Company, hereinafter called the Wilson Company, owned and controlled by Wilson. These companies had carried on business in competition with each other for several years, and they owned and controlled the only abstract plants in Tacoma and Pierce county. In 1909 the competition between them was keen, and they were cutting prices. On December 6, 1909, the Wilson Company executed and delivered to Willoughby, the actual manager of the Washington Company, and to Franklin Fogg, the manager of the Commonwealth Company, a lease for five years of the plant of the Wilson Company, with an option to purchase the same within two years at an agreed price. The lease provided that the abstract plant should remain in the exclusive possession of the Wilson Company, but should not be operated, and that the Wilson Company and its officers should not, during the life of the lease, be interested in any other abstract plant in Pierce county. On December 7, 1909, Willoughby assigned his interest in the lease to Franklin Fogg. On the same day the Title Insurance & Investment Company of Tacoma, hereinafter named the Tacoma Company, was organized, with a capital stock of $5,000, and it purchased from the Washington Company the latter's abstract plant and business for the sum of $100,000, of which $10,000 was paid in cash, the remainder to be paid in deferred payments, with interest at 7 per cent., semiannually, to secure which notes of the Tacoma Company and a chattel mortgage of the property purchased, together with a set of current files complementary thereto, the property of the Commonwealth Company, of an estimated value of $25,000, were executed by the Tacoma Company to the Washington Company; the Commonwealth Company thereby contributing the current files to the security of the mortgage. The mortgage provided that the plant should be operated as a going concern, and kept up to date, and that every endeavor should be made to build up its business and increase its good will, and the mortgagee was empowered to name a competent person to be employed by the mortgagor to see that the plant was kept up to date and properly posted and indexed. The original stock of the Tacoma Company was subscribed to by Willoughby and two others, and they, on December 30, 1909, turned over all the stock to the stockholders of the Commonwealth Company, who divided it among themselves in proportion to their holdings in the latter company. Willoughby had received from Fred and Franklin Fogg an agreement to save him harmless by reason of his subscription. The result of these transactions was to place the abstract business in Pierce county in the hands of the Commonwealth Company and the Tacoma Company, in both of which the stockholders were substantially the same. The mortgage and the notes were as-

signed by the Washington Company to the Traders' Trust Company of Oregon, as trustee, a company of which Willoughby and Smith and wife were the sole stockholders. The Tacoma Company paid on the notes and the interest due to June 7, 1911, the total sum of $29,100.

In 1910 a new company, the Tacoma Title Company, entered into the abstract business in Pierce county. In July, 1911, the Foggs complained of the general depression and falling off of the abstract business, and the competition of the Tacoma Title Company, and the inability of the Tacoma Company to meet the payments, and proposed an amalgamation of the companies, the mortgagee to take preferred stock in place of the mortgage and notes. After prolonged negotiations a new arrangement was made on December 2, 1911, of which the following is the substance: The mortgage and the notes were surrendered. The Tacoma Company executed a new series of notes. aggregating $80,000, bearing interest at 5 per cent. payable semiannually, to secure the payment of which it was agreed that the abstract plant of the Washington Company should be boxed and delivered to a trustee in Portland, to remain in pledge until the indebtedness was satisfied, or a court should decree a foreclosure. For further security the Commonwealth Company agreed to guarantee the payment of the interest to and including December 7, 1915, and the payment of principal and interest to and including the year 1921, and agreed to make and to deliver to the trustee the necessary take-offs to keep the plant up to date. To secure this undertaking the Commonwealth Company made a mortgage of its real property in Tacoma in the sum of $15,000, and all the stockholders of the Commonwealth Company ratified the undertaking, and guaranteed that their corporation had such powers, and that its agreements were for a valid consideration, and were binding on the corporation. Following the execution of these instruments, Willoughby and Smith, in consideration of the agreements already made between the various corporations, covenanted with the Tacoma Company that, as long as the agreements theretofore made were kept and performed, they would not, directly or indirectly, transact any abstract business or title insurance business in Pierce county.

In compliance with its guaranty agreement the Commonwealth Company paid the semiannual installments of interest up to and including June 7, 1911, amounting in all to $10,000. Owing to the condition of the abstract business, which continued to decline after December 2, 1911, the Commonwealth Company found that it could not continue to fulfill its guaranty agreement without loss, and an unsuccessful effort was made to adjust matters between the parties. Thereafter the present suit was brought by the Lumbermen's Trust Company, trustee, as assignee of the Traders' Trust Company, the original trustee, to enforce the agreement of December 2, 1911, and to foreclose the mortgage. To that suit the Commonwealth Company in its answer alleged that the agreements were void as creating a monopoly in violation of the Constitution and laws of Washington, and against public policy. The Tacoma Company made a similar answer. The court below found upon the pleadings and the facts that the guaranty given by the Commonwealth Company was invalid, as prohibited by article 12, § 6, of the Constitution of Washington, which forbids corporations to "issue any bond or other obligation for the payment of money, except for money or property received or labor done," and that it followed therefrom that the individual guaranty of the Foggs and Gove was also invalid; that the suit upon the mortgage was prematurely brought, and that the notes and the mortgage were void, for the reason that they were given for the purpose of creating a monopoly; that the taint of the transaction wherein they were executed attached to the sale and mortgage of 1909, and that all subsequent agreements were in furtherance of the original unlawful purpose. The bill was dismissed.

Frank H. Kelley, of Tacoma, Wash., John H. Hall, of Portland, Or., and Robert M. Davis and Frank C. Neal, both of Tacoma, Wash., for appellant.

Charles O. Bates, Charles T. Peterson, and Edward Fogg, all of Tacoma, Wash., for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVER-TON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] We turn first to the question whether the original sale of the Washington Company to the Tacoma Company and the contemporaneous lease of the Wilson Company created a monopoly in the vendee and the lessee within the prohibition of the Constitution of Washington. The Commonwealth Company was the first corporation to engage in the abstract of title business in Pierce county. For a time it had a monopoly of that business, so far as such a business could be monopolized; but, of course, the monopoly cannot be said to have been unlawful. On December 6, 1909, there were three corporations engaged in the business. One of them, the Commonwealth Company, by means of a new corporation which it organized for that purpose, bought out the Washington Company, and at the same time took a lease of the plant of the Wilson Company. When the Washington Company sold out, it sold out absolutely. It acquired no interest in the purchasing company, and it retained no interest in the property sold. The transaction did not diminish production, nor did it serve to increase prices. It was unattended by any agreement of the selling company or its members not to enter into competition. The fact that the Washington Company reserved the right to have a competent person employed at the expense of the vendee to see that the plant which the vendor sold was continually kept up to date until the purchase price was paid was not a retention by the vendor of an interest in the property sold. It was but a provision for the protection of the property, which was mortgaged as security for the deferred payments of the purchase price. Nor is evidence of a retention of interest by the Washington Company or its stockholders in the property transferred to the Tacoma Company to be found in the fact that Willoughby became temporarily a stockholder of the Tacoma Company or the fact that he was temporarily one of the lessees of the Wilson Company. The whole transaction indicates but a purpose, in which Willoughby assisted, to transfer the property of the Washington Company to the Tacoma Company, and to lease to the latter company the property of the Wilson Company. In Cooke on Combinations (2d Ed.) § 116, it is said:

"A monopoly exists where all, or so nearly all of an article of trade or commerce within a community or district, is brought within the hands of one man, or set of men, as to practically bring the handling or production of the commodity or thing within such single control, to the exclusion of competition or free traffic therein."

Assuming that the business of furnishing abstracts of title may become the subject of a monopoly, it is obvious that it can never be a monopoly within the meaning of the language of the text-writer just quoted. The combination so referred to is a combination whereby the whole of a marketable product is placed under single control. It

is obviously impossible to place the production of abstracts of title under a single control. The records of title are open to the inspection of all, and all are free to enter into the business of furnishing abstracts. The business is not susceptible of monopoly in the sense in which the business of dealing in a commercial product may be monopolized.

[2] Article 12, § 22, of the Constitution of Washington provides:

"Monopolies and trusts shall never be allowed in this state, and no incorporated company * * * in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees, or assignees of such stockholders * * * or in any manner whatever, for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity. The Legislature shall pass laws for the enforcement of this section."

The Legislature has as yet passed no law for the enforcement of the section, and we have for our guidance only the constitutional provision. There is nothing in its terms which renders illegal the transactions in question here. The case does not come within the specific provision, which forbids a corporation to combine or make any contract with any other corporation for the purpose of fixing prices or limiting production. Nor do the transactions create an illegal monopoly or trust. The case before us is simply one where three competing corporations have remedied a situation in which each was facing loss and possible insolvency. One of them bought out one of its competitors, and took a lease of the plant of the other. The mere fact that one of the purposes of the purchasing company was to suppress competition does not of itself render the transaction the creation of a monopoly. There was no intention to wrong the general public. The prices remained thereafter as they had been before the ruinous price cutting intervened. We find no principle of public policy or provision of the Washington law that requires that two or more persons or corporations engaged in the same business, whose competition threatens ruin to all, shall continue in that competition until one or more is forced out of business, or that prohibits the ending of the destructive competition by the voluntary act of the competing parties, by one purchasing and the others selling competing plants, thus securing economy of administration, so long as the transactions are unaccompanied by circumstances to indicate that the contracts were entered into only as a device to enhance prices or to secure control of the market. In Cincinnati Packet Co. v. Bay, 200 U. S. 179, 184, 26 Sup. Ct. 208, 209 (50 L. Ed. 428), Mr. Justice Holmes said:

"A contract is not to be assumed to contemplate unlawful results unless a fair construction requires it upon the established facts."

In Trenton Potteries Co. v. Oliphant, 58 N. J. Eq. 507, 43 Atl. 723, 46 L. R. A. 255, 78 Am. St. Rep. 612, the court said:

"A person engaged in any manufacture or trade, having the right to acquire and possess property and to do with it what he chooses, may lawfully buy the business of any of his competitors. His first purchase would at once diminish competition. If he continued to purchase, each succeeding transaction would remove another competitor. If his capital was large enough to enable him to buy the business of all competitors, the last purchase would completely

exclude competition, at least for a time. But in the absence of legislative restrictions (if such could be imposed) upon the acquisition of such property and its use when so acquired courts could impose no limitation. They would be obliged to enforce such contracts, notwithstanding the effect was to diminish, or even to exclude, competition."

In Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464, the court said:

"We are not aware of any rule of law which makes the motive of the covenantee the test of the validity of such a contract. On the contrary, we suppose a party may legally purchase the trade and business of another for the very purpose of preventing competition, and the validity of the contract, if supported by a consideration, will depend upon its reasonableness as between the parties."

In C., C., C. & I. R. Co. v. Closser, 126 Ind. 348, 26 N. E. 159, 9 L. R. A. 754, 22 Am. St. Rep. 593, the court said:

"We are not required to decide, nor do we decide, that combinations fair to the public, untainted by any sinister design, and formed solely to prevent the destruction of business by unregulated competition, may not be valid."

The statute of Missouri prohibited any corporation from creating or entering into any pool, trust, agreement, combination, confederation, or understanding with any other corporation, partnership, individual, or any other person or association of persons to regulate or fix prices, or maintain prices when so regulated and fixed. In State v. International Harvester Co., 237 Mo. 369, 141 S. W. 672, the court said:

"A corporation formed for the purpose of actually acquiring the absolute and complete title to properties and plants formerly in .competition, and of operating the same under a new management and control so as to secure greater efficiency and more economical administration, is not within the statutory prohibition merely because of the incidental ending of competition arising from such organization. Any other rule would prohibit competing individuals from forming partnerships, and corporations from purchasing the property of others or from consolidating with another."

So in State v. Continental Tobacco Co., 177 Mo. 1, 75 S. W. 737, the court held that the purchase by one corporation of the plants of another, if done in good faith, in the legitimate conduct and management of its business, is the exercise of a legal right. In Camors-McConnell Co. v. McConnell (C. C.) 140 Fed. 412, the court said:

"The sale and transfer by a person of his property and good will to another cannot be repudiated on the ground that the purchaser acquired the property for the purpose of obtaining a monopoly of the business, and in pursuance of an illegal combination in restraint of trade."

In United States v. Reading Co. (C. C.) 183 Fed. 427, it was held that the mere extent of acquisition of business or property achieved by fair and lawful means cannot be the criterion of monopoly within the meaning of the Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209); but, in addition to acquisition and acquirement, there must be an intention, by unlawful means, to exclude others from the same traffic or business, or from acquiring by the same means property and material things. In United States v. Great Lakes Towing Co. (D. C.) 208 Fed. 733, it was held that the sale of a business and the sur-

render of the good will pertaining thereto, and an agreement thereunder, within reasonable limitations as to time and territory, not to enter into competition with the purchaser, when made as part of the sale of the business, and not as a device to control or monopolize interstate commerce, is not within the federal Anti-Trust Act. Davis v. A. Booth & Co., 113 Fed. 31, 65 C. C. A. 269, was a case in which a corporation engaged in the business of buying and selling fish sold out its assets and good will to another corporation, and the seller no longer retained any interest in the property, so that the sale was not a mere combination of owners and properties under one management. It was held that the sale was not in violation of the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209). Said the court:

> "There is a clear distinction, which seems to be lost sight of in the argument here, between the aggregation of properties by purchase when the seller no longer retains an interest in the property, and a combination of owners and properties under one management, where each owner's interest is continued in the combination."

In Munter v. Eastman Kodak Co., 28 Cal. App. 660, 153 Pac. 737, construing statutes of California which prohibited combinations to create or carry out restrictions in trade or commerce, or to limit or reduce the production, or increase the price of merchandise, or of any commodity, or to prevent competition in manufacturing, making, transportation, or sale of manufactured products or any commodity, the court said:

> "There is no violation of the statute in the mere act of a person purchasing or otherwise securing control of a number of different concerns engaged in the business of manufacturing and selling the same article or commodity."

In Oakdale Mfg. Co. v. Garst, 18 R. I. 484, 487, 28 Atl. 973, 974 (23 L. R. A. 639, 49 Am. St. Rep. 784), the court said:

> "Monopolies are liable to be oppressive, and hence are deemed to be hostile to the public good. The combinations for mutual advantage which do not amount to a monopoly, but leave the field of competition open to others, are neither within the reason nor the operation of the rule."

[3] There is nothing in the transactions of December 2, 1911, which imports illegality into the contracts, or creates an illegal monopoly if none had existed before. The Tacoma Company found itself unable to meet its obligations. An adjustment was had whereby its notes and mortgages were surrendered and canceled, and new notes and a mortgage on more favorable terms were executed. For further security the Commonwealth Company, which was in fact the Tacoma Company, guaranteed the payment of principal and interest to a certain date. This was done by the authority of a resolution of the directors of the Commonwealth Company and with the assent of all its stockholders. In addition thereto the stockholders gave their personal guaranty. At this time a competing company was in the field, doing from 10 to 20 per cent. of the business, and that company in 1914, at the expiration of the Wilson lease, became the lessee of the Wilson plant, and thereafter operated it, and did about 40 per cent. of the abstract of title business in Pierce county.

[4] Nor does the fact that a corporation, in selling out its business to another, covenants not to engage in the same business within a certain area and within a reasonable time, tend in any way to create a monopoly. In Camors-McConnell Co. v. McConnell, supra, the court said:

"In the sale of a going business * * * with the good will attached, where, as ancillary and incident thereto, the seller enters into a covenant with the buyer that he would not compete with him in any way as to diminish the value of the property or business sold, although such covenant may be in partial restraint of trade, it should be upheld and enforced."

To the same effect are Davis v. A. Booth & Co., supra, United States v. Great Lakes Towing Co. (D. C.) 208 Fed. 733, and United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122.

[5] The attack upon the legality of these contracts comes, not from the public, or from any one who claims to have been injured thereby, but from parties who deliberately entered into them. Before such contracting parties can be absolved from their solemn obligations, it must be shown that their agreements are clearly and manifestly injurious to the interest of the public. "It has been clearly recognized in recent times that public policy is at least as much concerned in holding persons to their contracts as in prohibiting contracts in restraint of trade." Joyce on Monopolies, § 94. In Printing and N. R. Co. v. Sampson, L. R. 19 Eq., 462, 465, it was said:

"It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice."

[6] It is contended that the obligation of the Commonwealth Company of December 2, 1911, and consequently the guaranty of its stockholders, are void, as forbidden by section 6, article 12, of the Constitution of the state. That section is as follows:

"*Limitations upon Issuance of Stock.*—Corporations shall not issue stock except to bona fide subscribers therefor, or their assignees, nor shall any corporation issue any bond or other obligation for the payment of money, except for money or property received or labor done."

The argument is that the guaranty of the Commonwealth Company and its stockholders created an obligation for the payment of money, and that, not having been given in consideration of money or property received or labor done, it is within the prohibition of the Constitution, and is void. The caption of the section, "Limitations upon Issuance of Stock," and the language of the section lead to the conclusion that the phrase "other obligation for the payment of money," therein prohibited, was intended to be of the same nature as "bonds," under the rule of ejusdem generis. Similar provisions are found in the Constitutions of many of the states. In Memphis, etc., Rd. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595, the court had under consideration the Constitution of Arkansas which prohibited the issu-

ance of stock or bonds except for money or property actually received or labor done, and the court said that the prohibition—

"was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value."

The guaranty here in question was executed for property actually received. The Commonwealth Company was in fact the purchasing company. It organized the Tacoma Company for the purpose of receiving title to the purchased property, but the stock in the latter company was held by the stockholders of the Commonwealth Company in the same proportions as their stock was held in that company. In that manner the Commonwealth Company acquired the purchased property, and we see no reason in law or equity why its undertaking to pay for the same should not be enforced. To guarantee the payment of its own indebtedness was not to "issue" bonds or other obligations for the payment of money. No bonds or other obligations were thereby issued or placed in circulation. The guaranty was not an instrument that passed by delivery and indorsement. As a consideration for the guaranty there was not only an existing indebtedness, but there was a present moving consideration in the refunding of the indebtedness on more favorable terms, and the release of a burden that had been imposed upon the guarantor.

[7] But if the constitutional prohibition of Washington was not intended for the purpose indicated in Memphis, etc., Rd. v. Dow, it could only have been intended for the protection of stockholders and creditors of corporations. There is no question here of the right of creditors. So far as it appears, the plaintiff is the only creditor. There can be no doubt that the stockholders could waive their right to the constitutional protection, there being involved no question of detriment to the community, and this they did by ratifying the undertaking of the corporation and giving their individual guaranties. In Cooley's Constitutional Limitations (5th Ed.) p. 216, it is said:

"Where a constitutional provision is designed for the protection solely of the property rights of the citizen, it is competent for him to waive the protection, and to consent to such action as would be invalid if taken against his will."

In Pierce v. Somerset Railway, 171 U. S. 641, 648, 19 Sup. Ct. 64, 43 L. Ed. 316, the court said:

"A person may by his acts or omission to act waive a right which he might otherwise have under the Constitution of the United States as well as under a statute."

[8] The question is presented whether or not the suit was prematurely brought. The mortgage of the Tacoma Company provides:

"Time shall be and is of the essence of this agreement, and in the event of the failure of the first party to pay any of the said notes at the time specified in said notes, or to pay any taxes which the first party agrees to pay, and after the continuance of such default for the period of one (1) year, then the whole of said notes shall, at the option of the second party, forthwith and without notice, mature, and the second party shall be entitled forthwith to foreclose said pledge: * * * Provided, that nothing

in this paragraph or in this agreement shall be construed to prevent the second party at its option from suing upon any unpaid installment of principal and interest without waiting for the expiration of one (1) year from the date of default, provided ninety (90) days notice of such default shall have first been given in writing to the first party or its assigns."

The notes contain the provision:

"Interest to be paid semiannually at Tacoma, and, if not so paid, the whole sum of principal and interest to become immediately due and collectible, at the option of the holder of this note."

We think that the cause of action had matured when, on February 8, 1916, the suit was begun. There was no default in the payment of principal until December 7, 1915, but interest had been in default since December, 1914, and due notice had been immediately given of the default. It is plain from the terms of the notes that default in payment of any installment of interest rendered the whole of the notes, principal and interest, due and payable at the option of the holder. In 27 Cyc. 1135, it is said:

"Where a mortgage is given to secure the payment of a note or bond, the two instruments being made at the same time, they are to be read and construed together as parts of the same transaction, and hence the terms of the one may explain or modify the other, and a stipulation or condition inserted in the one is an effective part of the contract of the parties, although not found in the other, provided there is no necessary inconsistency. But in respect to the terms of the debt or interest, or the time of its payment, if the note and mortgage contain conflicting provisions, the note will govern as being the principal obligation."

Cases so holding are Kansas Loan & Trust Co. v. Thayer, 9 Kan. App. 888, 58 Pac. 238; New England Mortgage Security Co. v. Casebier, 3 Kan. App. 741, 45 Pac. 452; Fletcher v. Daugherty, 13 Neb. 224, 13 N. W. 207; Rothschild v. Rio Grande W. Ry. Co., 84 Hun, 103, 32 N. Y. Supp. 37; Bastin v. Schafer, 15 Okl. 607, 85 Pac. 349. In Lovell v. Musselman, 81 Wash. 477, 142 Pac. 1143, the court said:

"The law is that, if a note and mortgage contain conflicting provisions, the note will govern as being the principal obligation."

[9] Again, the objection that the suit was prematurely brought was one that could be waived by the defendants, and we are of the opinion, that it was waived when, without presenting the objection in any way to the court below, they answered to the merits, denying certain allegations of the complaint, alleging the illegality of the contracts, and resting their case upon those defenses. In 1 C. J. 1152, § 399, it is said:

"It is ordinarily held that, if defendant without objection appears and pleads to the merits of the action, he cannot thereafter object that it was prematurely commenced."

See Kansas City So. Ry. Co. v. Greer, 90 Ark. 531, 119 S. W. 1121; Anthony v. Smithson, 70 Kan. 132, 78 Pac. 454; Ross v. Chambliss, 5 La. Ann. 158; Googins v. Gilmore, 47 Me. 9, 74 Am. Dec. 472; Harris v. North American Ins. Co., 190 Mass. 361, 77 N. E. 493, 4 L. R. A. (N. S.) 1137; McClung v. McPherson, 47 Or. 73, 81 Pac. 567, 82 Pac. 13; Welch v. Miller, 210 Pa. 204, 59 Atl. 1065.

The decree is reversed, and the cause is remanded to the court below, with instructions to enter a decree in accordance with the foregoing opinion.