## In re JOHN B. ROSE CO.

## Appeal of METROPOLITAN BANK.

(Circuit Court of Appeals, Second Circuit. June 1, 1921.)

No. 225.

1. **Corporations** ⊕484(3)—**Generally without power to become guarantor.**

A corporation ordinarily is without power to enter into a contract of guaranty, though the existence of such power is sometimes implied when necessary to enable the corporation to accomplish the objects for which it is created' or when it is reasonably necessary in the conduct of its business.

2. **Corporations** ⊕484(3)—**Directors cannot authorize guaranty which is ultra vires.**

A guaranty executed by a corporation otherwise ultra vires is not validated because authorized by its board of directors.

3. **Corporations** ⊕484(3)—**Guaranty by corporation held void as ultra vires.**

A guaranty executed by a corporation to a bank, covering any indebtedness then or thereafter contracted to the bank by its president, pursuant to which the president discounted with the bank notes of third persons or corporations payable to him personally, and the proceeds were paid out on his personal checks, *held* void as ultra vires, where the evidence did not show that the guarantor had any interest in the notes discounted or received the benefit of their proceeds.

4. **Corporations** ⊕484(3)—**Corporation must control another to make it a subsidiary.**

While a corporation may execute a valid guaranty of indebtedness contracted by a subsidiary, constituting a part or branch of its business organization, to make one corporation a subsidiary of another within the rule, it is necessary that the one company should itself control the other, and the fact that the president of one corporation is also president and controls a majority of the stock of a second, which has subsidiaries of which it owns all the stock, does not make the second corporation or its controlled companies subsidiaries of the first, which has no stock, interest in, or control over any of them.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the John B. Rose Company, bankrupt. On appeal by the Metropolitan Bank from an order of the District Court. Affirmed.

See, also, 275 Fed. 409.

The John B. Rose Company is a corporation organized under the laws of the state of New York, and was adjudicated a bankrupt on June 11, 1918.

The Metropolitan Bank on September 24, 1918, filed proof of claim in the sum of $25,000.

The proof of claim is based upon an alleged guaranty which may be found in the margin.[1]

---

[1] "In consideration of the sum of one dollar to us, John B. Rose Co. of New York, N. Y., paid by the Metropolitan Bank of New York, the receipt of which is hereby acknowledged, and for other good and valuable considerations, we hereby jointly and severally promise and guarantee to said bank to pay to it (all present and future indebtedness and indebtednesses, liability and liabilities, of John B. Rose, on his bills receivable doing business in New York, N. Y., whether he shall be alone liable, or is or shall be liable jointly with another or others to said Metropolitan Bank, New York, whether such liabil-

The proof of claim invokes the guaranty in respect of 16 promissory notes which aggregate something in excess of $25,000. The notes were all drawn to the order of John B. Rose and were indorsed by him. They were discounted by the bank which placed the money to the credit of his individual account.

The order adjudicating the John B. Rose Company a bankrupt contained the usual provision referring the matter to a referee in bankruptcy to take such further proceedings as required by the act of Congress.

The trustee of the bankrupt moved to expunge the claim of the bank on the ground that the guaranty on which the claim rested was ultra vires the John B. Rose Company and therefore void.

The referee in bankruptcy allowed the claim. The District Court overruled the order of the referee, and on November 15, 1920, entered an order disallowing the claim and expunging it from the list of claims against the estate of the bankrupt.

The bank seeks to uphold the guaranty upon the theory that while the bank account was in the name of Rose personally, it was for the benefit of the John B. Rose Company and the subsidiary companies to which reference has been made.

Butcher, Tanner & Foster, of New York City, for appellant.

Hughes, Rounds, Schurman & Dwight, of New York City (Richard E. Dwight and Allen S. Hubbard, both of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1] A corporation ordinarily is without power to enter into a contract of guaranty, as such a contract is foreign to the objects of its creation and hazards its funds in a manner unwarranted by the contract which

---

ity or liabilities be now contracted or incurred, or be hereafter contracted or incurred, at one or several different times, and in one or several different amounts or sums; and we hereby jointly and severally agree with said Metropolitan Bank, New York, that this shall be a continuing liability, promise and guarantee to it by us, to pay to it at maturity all present and future liability and liabilities, and indebtedness and indebtednesses of said John B. Rose of New York, N. Y., either alone or jointly with another or others, to said Metropolitan Bank, New York, at however many times and in whatever sums and amounts incurred or contracted).

"But our liability hereon shall only compel us to pay in the aggregate the amount of twenty-five thousand ($25,000) dollars, and our liability hereon shall cease for all indebtedness of said John B. Rose to said Metropolitan Bank, New York, contracted or incurred after notice in writing received by said Metropolitan Bank, New York, to the effect that we will not be liable to it for any indebtedness or liability of the said John B. Rose contracted or incurred after such notice in writing.

"Witness our hand and seal this 15th day of January, 1918. In the presence of John B. Rose Co.                    [Signed] John B. Rose, President.

"[Signed] Oscar A. Freyer.

"At a meeting of the directors of the John B. Rose Company held this day, a quorum being present, it was—

"Resolved, that the president be and hereby is authorized on behalf of the John B. Rose Company to execute and deliver the above guarantee to the Metropolitan Bank, guaranteeing the payment of bills receivable in the aggregate and amount of twenty-five thousand dollars.

"John B. Rose Co.
"[Signed]    John B. Rose, President.
"Robt. T. Foyd, Secy.

"[Signed]    Oscar A. Freyer."

275 F.—27

exists between it and the state, and between it and its stockholders. The existence of such a power is sometimes implied, however, when it is necessary to enable a corporation to accomplish the objects for which it is created, or when it is reasonably necessary in the conduct of its business.

It appears that the bankrupt, the John B. Rose Company, which gave the guaranty, was a corporation engaged in the excavation and sale of sand and gravel for building and construction purposes, and in the sale of brick and other building material. In carrying on its business it had barges engaged in the transportation on the Hudson river of brick, sand, and gravel. It did not itself manufacture brick, but obtained it from the Rose Brick Company and the Alpha Company. The Coney Island Construction Company and the other subsidiary companies sold the brick for the John B. Rose Company instead of the John B. Rose Company selling it direct. The John B. Rose Company had no interest in the sale of the brick except to the extent of its commission as the agent of the Rose Brick Company.

It may be assumed, unless there are special circumstances disclosed in the record which make this case an exception to the general rule, that the John B. Rose Company, being a manufacturing and sales company, had no implied power to loan its credit or to guarantee the individual paper of John B. Rose. While a corporation organized for manufacturing purposes may guarantee paper which it owns, or paper which it negotiates in due course of business and the proceeds of which it receives, it cannot be maintained that the power to guarantee the personal notes of a third person for his accommodation is possessed by it as being "essential to the transaction of its ordinary affairs" nor within "the legitimate objects of its creation." In the case of In re Prospect Leasing Co., 250 Fed. 707, 709, 163 C. C. A. 39, this court recently declared the rule to be fundamental that a corporation had no implied power to make accommodation paper. We did not apply the rule in that particular case because the corporation had received a valuable consideration for its indorsement inasmuch as a cause of action against the corporation was released.

In Ward v. Joslin, 186 U. S. 142, 149, 22 Sup. Ct. 807, 46 L. Ed. 1093, the court declared that ordinarily corporations have no implied power to bind themselves by accommodation indorsements, or to guarantee the paper of a third person which they do not own. And in Louisville, New Albany & Chicago Railway Co. v. Louisville Banking Co., 174 U. S. 552, 567, 19 Sup. Ct. 817, 43 L. Ed. 1081, the court declared that a railroad corporation, unless authorized by its act of incorporation or a statute, had no power to guarantee the bonds of another corporation and that such a guaranty was "beyond the scope of the powers of the corporation, and strictly ultra vires, unlawful and void, and incapable of being made good by ratification or estoppel."

In Jacobus v. Jamestown Mantel Co., 211 N. Y. 154, 160, 105 N. E. 210, 212, the New York Court of Appeals declared that—

"A manufacturing corporation has no power to make or indorse notes for the accommodation of others. * * * One who deals with the officers or

agents of a corporation is bound to know their powers and the extent of their authority."

The rule is so familiar and is so well established that citations in support of it are quite unnecessary. The real question involved must be whether there are any circumstances disclosed in the record which make the rule inapplicable to the case under consideration.

The document containing the guaranty is set forth in the statement preliminary to this opinion. On its face it appears to be for the personal benefit of Rose. It guarantees "all present and future indebtedness and indebtednesses, liability and liabilities of John B. Rose," "whether he is or shall be alone liable, or is or shall be liable jointly with another or others." It appears to be an agreement which is ultra vires the corporation. In view of the apparent ultra vires character of the guaranty the burden of proof is on the creditor, in this case the Metropolitan Bank, to prove by a preponderance of evidence that each of the notes which it discounted was discounted for the benefit of the John B. Rose Company and that the moneys so derived were for the use and benefit of that company.

[2] The guaranty given to the claimant bank appears to have been authorized at a meeting of the directors of the John B. Rose Company. But if the guaranty were otherwise ultra vires it could not be made intra vires as against creditors even if it had been authorized by all the directors and the stockholders. In re Prospect Worsted Mills (D. C.) 126 Fed. 1011, 1014; Murphy v. Arkansas, etc., Improvement Co. (C. C.) 97 Fed. 723, 727; Germania Safety Vault & Trust Co. v. Boynton, 71 Fed. 797, 19 C. C. A. 118; J. G. Brill Co. v. Norton, etc., St. Ry. Co., 189 Mass. 431, 75 N. E. 1090, 2 L. R. A. (N. S.) 525; Cook v. American Tubing & Webbing Co., 28 R. I. 41, 53, 65 Atl. 641, 9 L. R. A. (N. S.) 193.

[3] The testimony of the president of the claimant bank as to the circumstances under which he agreed to accept the guaranty of the John B. Rose Company does not disclose that the money realized from the discounting of the notes was to be used for the benefit of the John B. Rose Company, or that any representations were made to him that the guaranty was for the benefit of the corporation. Asked to give "the full conversation" he had on the subject with John B. Rose, he said that Rose approached him on the subject of discounting some notes:

"I told him we were willing to discount those papers. He told me they were commercial notes, and I said we would discount those notes, provided we had the notes endorsed and guaranteed by a responsible party. He offered the guaranty of the John B. Rose Company. I told him I would give him $25,000 to start with. He was satisfied. I then had a paper made out, as he told me that he required the money on January 15th.

"He took the guaranty along, and on the 15th of January his cousin or brother, a man by the name of Rose, called on me and brought me several notes, less than $25,000, and gave me that guaranty; and on the strength of that I gave instructions to discount the paper, and to open an account."

He was asked and answered further as follows:

"Q. What did he say to you? Did he say he wanted to discount paper with you? A. Sure. Q. And what was the character of the paper he said

he wanted to discount with you? A. Commercial paper. Q. Arising how? A. Commercial paper must have some commercial transaction. Q. Was it a transaction in connection with the sale of merchandise? A. I did not ask, or care. Q. Did Mr. Rose say he was in the business of buying and selling merchandise? A. No, sir. Q. What did he say? A. He said he was the president of the John B. Rose Company, manufacturers of brick, I think it was. Q. And he did not say he was in business? A. No, sir. Q. You did not so understand, either, did you? A. No. I did not care as long as there was a satisfactory guaranty."

We have examined the record carefully to see whether any circumstances are disclosed which would justify the guaranty, and we have found none. If the John B. Rose Company received any consideration for its guaranty the fact does not appear. The evidence fails to show that the money realized by the discount of the notes covered by the guaranty was obtained at the request of the John B. Rose Company for its use, or that it was applied to its benefit. On the contrary, we think it appears that the guaranty was given for the accommodation of John B. Rose individually.

Henry Ollesheimer, the president of the appellant bank, was asked as to the notes he discounted and testified as follows:

"Q. And they were not made by the John B. Rose Company? A. No, sir. Q. And did not bear the indorsement of the John B. Rose Company? A. No, sir.; it was not necessary.

"By Mr. Dwight: Q. They were not payable to the John B. Rose Company? A. No, sir. Q. Didn't it occur to you that John B. Rose might be exceeding his authority in discounting these notes for his own credit? No, sir; those are matters which occur every day. Q. Didn't you notice that this guaranty is a guaranty of the John B. Rose Company and not of John B. Rose individually? A. If it had been his own company in it, it would not be necessary, as he indorsed them individually."

As ordinarily a corporation has no implied authority to enter into a contract of guaranty and only possesses the power when under the circumstances it is a necessary or proper means of accomplishing a purpose authorized by its charter, a bank acts at its peril in relying upon such a contract without inquiry. And yet the testimony of the president of the claimant bank indicates that he discounted notes made to Rose individually and placed the proceeds of them all to Rose's individual credit and paid them out on his individual check in reliance on the guaranty of the John B. Rose Company without any inquiry whatever into the circumstances to ascertain whether the guaranty was or was not ultra vires. It is perfectly apparent that at the time it never occurred to him to make the inquiry and the matter was one of indifference.

The testimony of Rose, however, is that he informed the president of the bank that the proceeds realized from the discounted notes were to be used in the John B. Rose Company's business. The following is an excerpt from his testimony:

"Now, what in this conversation, was said about the purpose of your opening up this account with the Metropolitan Bank and the issuance of this guaranty? A. I stated, to the best of my recollection and belief, that we would offer for discount—that John B. Rose would offer for discount paper which would be guaranteed by the John B. Rose Company, and the proceeds

used in the John B. Rose Company business. Q. What was intended to be done with the money? A. Used in the business of the John B. Rose Company and the subsidiaries, and that was done. Q. Was that what you stated to Mr. Ollesheimer? A. That is my recollection.

"Mr. Dwight: I move to strike out the last part of Col. Rose's answer to the last question where he interpolated the words 'and that was done.'

"Mr. Hanford: Let it be stricken out. We will show what was done.

"The Referee: I think I will strike that out, that the proceeds were to be used for the benefit of the John B. Rose Company."

The testimony shows that the notes upon which the claimant bank seeks to hold the John B. Rose Company liable were all discounted subsequent to April 5, 1918. It also shows that out of the proceeds of such notes deposited in the individual account of John B. Rose he checked out for admittedly personal expenditures various sums aggregating $1,400. It appears too that the John B. Rose Company received only $4,000 out of the proceeds realized from the discounted notes aggregating more than $25,000. It fails to show for what purpose the $4,000 was paid, whether it was to discharge debts due from Rose to the company or whether it was money advanced to the company. The remaining sums were paid to the so-called "subsidiary" companies, but the purpose for which the money was paid to them is not proved. The unsatisfactory character of the testimony on that subject may be seen in the following excerpt from the testimony of Rose:

"Q. Now, take the first check, N. & W. J. Peck Company, $4,931.18, did you owe the Peck Company that money? A. I do not know anything about those checks which were drawn.

"Q. Why did you pay the check for $4,931.18? A. I do not know.

"Q. Do you know why you paid any of the checks, aside from those for your own personal account? Just tell us if there are any which you know why you paid them. A. I do not know whether these were drawn, or why these were drawn. Here is one (indicating), $4,931.18, charged to the Peck Company.

"Q. Did you owe the Peck Company at that time? A. I do not know anything about it. I presume the John B. Rose Company is running the John B. Rose Company office, and I presume that is money paid for them to the Peck Company. I signed these in blank; I authorized them; I am responsible for them; and I do not know how they happened. I believe these checks were made payable to these companies, and I believe it was done on my authority, and I have indicated the ones which were to me personally. More than that I know nothing.

"Q. Do you know whether the John B. Rose Company received any credit for those sums? A. I do not know anything about it."

Proof that Rose, after the discount of the notes, paid moneys out of his individual account, in which the proceeds of the discounted notes were deposited, to the John B. Rose Company or to the Coney Island Construction Supply Company whose stock it owned, is not in and of itself proof that such note was discounted for either of such companies, or that either had such an interest therein as would change the nature of the guaranty as to the notes from that of an ultra vires to an intra vires transaction, and a fortiori as to moneys paid to the other companies none of whose stock the John B. Rose Company owned, as well

as to that paid to the Alpha Brick & Holding Company in which the John B. Rose Company was a mere minority stockholder.

It is significant:

1. That the discounted notes were all payable to the order of John B. Rose.

2. That the account opened with the claimant bank and in which the proceeds of the discounted notes were deposited was in the name of John B. Rose, and not in the name of the John B. Rose Company, or in that of John B. Rose, president.

3. That John B. Rose drew checks on this account for his personal expenses.

4. That there is no evidence which proves that he regarded the funds in this account as impressed with any trust for the John B. Rose Company or for any of the subsidiary companies.

The following are excerpts for Rose's testimony:

"Q. At the time you opened this account with the Metropolitan Bank, did you have a conversation with the president as to the nature or character of the notes which you expected to discount there?  A. I do not think that question came up.

"Q. Mr. Ollesheimer said that you stated that you expected to discount commercial paper negotiated in the ordinary course of business.  Do you recall such a conversation?  A. I may have; I do not remember it.

"Q. Those notes you discounted were all to your individual order, were they not?  A. I do not know.  * * *

"Q. Why did you open the account in your own individual name?  A. I do not know I did."

As respects the discounted notes it appears from his own testimony that they were for money due to Rose individually.  He testified as follows:

"Q. Were you on April 19, 1918, as an individual, as Col. Rose, a creditor of the N. & W. J. Peck Company for the amount of this note, $1,507.95—did they owe you that?  A. I think they owed me three or four times that.

"Q. Individually?  A. Yes, sir; for moneys advanced to them.

"By Mr. Dwight:  Q. Was this payment made to you for money due you individually?  A. They owed me money, and a good deal of it at that time."

And in reply to a statement made by the referee he said:

"I have in mind that these companies owe me money, all of them.  These companies all owe me money personally, as it shows, and several hundred thousand dollars."

It appears that the claimant bank discounted 16 notes made payable to the order of John B. Rose, that Rose testified that these companies owed him money, that Rose opened a personal account in the bank in which he deposited funds belonging to himself, and that from time to time he checked out of this account money for his own personal purposes.  The account was not opened until January 15, 1918, and the petition in bankruptcy was filed on June 7th of the same year.  The entire series of discounted notes range in date from March 26, 1918, to April 24, 1918.  Between January 15, 1918, and April 30, 1918, there was deposited in Rose's account with the bank an amount which aggregates $85,576.47.  This sum was not made up entirely of the proceeds of discounted notes.  It is admitted that he placed his personal funds

in the account, including the money paid him on his salary account. For example on January 25th he deposited $1,500 in that account, that being a payment of salary due to him from the John B. Rose Company.

The conclusion to which the testimony brings us is that the discounted notes were made payable to Rose individually because he had personally advanced to the makers, the so-called subsidiary companies, large sums of money, and that the notes were payments on indebtedness due from the companies to him. He was free to use the funds as he desired. They were his funds and were subject solely to his order. So much of them as he did not need for his personal expenses he used in such amounts as he determined in promoting his business enterprises through the agencies of the John B. Rose Company and the so-called subsidiary companies. But the funds so deposited in his name were not the funds of these companies and were not subject to their control.

[4] These being the facts as we derive them from the record, the question remains whether the John B. Rose Company could guarantee the payment of notes given by the subsidiary companies to John B. Rose in payment of indebtedness due to him for moneys advanced to them by him in carrying on the business in which they were engaged.

There are numerous cases in which it has been held that while a manufacturing or trading corporation has no power to give accommodation paper, such paper may nevertheless be enforced against it by a bona fide holder for value. National Bank, etc., v. Sancho, etc., Co., 186 Fed. 257, 110 C. C. A. 112; Florence, etc., Improvement Co. v. Chase National Bank, 106 Ala. 364, 17 South. 720; American, etc., Bank v. Gluck, 68 Minn. 129, 70 N. W. 1085; Blake v. Domestic Manufacturing Co., 64 N. J. Eq. 480, 38 Atl. 241; National Bank of the Republic v. Young, Receiver, 41 N. J. Eq. 531, 7 Atl. 488; Credit Co. v. Howe Mach. Co., 54 Conn. 357, 8 Atl. 472, 1 Am. St. Rep. 123; Jacobs Pharmacy Co. v. Southern Bkg., etc., Co., 97 Ga. 573, 25 S. E. 171; Mechanics' Banking Association v. New York, etc., Lead Co., 35 N. Y. 505; Monument National Bank v. Globe Works, 101 Mass. 57, 3 Am. Rep. 322. It cannot be claimed, however, that the question presented by the facts in this case involves the principle referred to. The rule is based on the law of negotiable paper.

It is said that a private corporation may even give away its assets if all the stockholders assent provided there are no creditors who are injured. The doctrine of ultra vires cannot be invoked against such acts, stockholders having acquiesced, as no one can object except creditors and the state. In Cook on Corporations (7th Ed.) vol. 1, § 3, that writer says:

"A private corporation may exercise many extraordinary powers, provided all of its stockholders assent and none of its creditors are injured. There is no one to complain except the state, and, the business being entirely private, the state does not interfere. Thus, 50 years ago the courts would summarily have declared it illegal for a business corporation to become an accommodation indorser of commercial paper. But to-day there is no rule of public policy which prohibits a private corporation having a capital stock from

becoming the accommodation indorser of commercial paper, provided such indorsement is made with the knowledge and assent of all the directors and stockholders, and provided corporate creditors are paid."

In the instant case, however, corporate creditors have not been paid and the corporation giving the guaranty has been adjudged bankrupt.

It has been held in numerous cases that a corporation may enter into a contract of guaranty when reasonably incidental to its authorized business. Green Bay, etc., R. Co. v. Union Steamboat Co., 107 U. S. 98, 2 Sup. Ct. 221, 27 L. Ed. 413; Central Lumber Co. v. Kelter, 201 Ill. 503, 66 N. E. 543; Smith v. Norwich City Water Commissioners, 38 Conn. 208; Thomas v. Hastings City National Bank, 40 Neb. 501, 58 N. W. 943, 24 L. R. A. 263. As where a sawmill company guaranteed the payment of interest on the bonds of a railroad company which penetrated the country from which its supply of timber was to be drawn. Mercantile Trust Co. v. Kiser, 91 Ga. 636, 18 S. E. 358. It is not necessary, however, to review in this connection these cases in detail.

In Mapes v. German Bank of Tilden, 176 Fed. 89, 99 C. C. A. 609, the principle is stated that it is beyond the powers of a corporation to guarantee the obligations of others in which it has no interest and from which it derives no benefit. So in Merchants' Bank of Valdosta v. Baird, 160 Fed. 642, 645, 90 C. C. A. 338, 17 L. R. A. (N. S.) 526.

In the case of In re New York Car Wheel Works (D. C.) 141 Fed. 430, the District Court for the Western District of New York held that where corporation A. held all the stock of corporation B. at the time of the guaranty the former could validly guarantee the notes of the latter; that in such a case the guaranty was for the benefit of the former and not in a technical sense for the accommodation of the latter. In that case corporation A. had indorsed the notes of corporation B. and it was held not to be an accommodation in a legal sense and therefore void but was a guaranty and valid. If that be sound law, then the John B. Rose Company might have guaranteed the notes of the Coney Island Construction Supply Company. But that is not what in fact it did, and we do not need to consider whether the principle above laid down is or is not in our opinion correct. It simply is not applicable to the facts of this case.

In Blake v. Domestic Manufacturing Co., supra, the Domestic Manufacturing Company indorsed notes made by persons who were the selling agents of another corporation known as the Domestic Sewing Machine Company and which were made payable to the order of the latter company and which were indorsed by the latter company. These notes having been discounted by the banks the proceeds were deposited in the banks to the credit of the manufacturing company and all the payments out were made on the checks of the manufacturing company. It was claimed that with the exception of about $10,000 the entire amount raised by the discount of the notes was used in paying the obligations of the sewing machine company and did not go to the use of the manufacturing company. The two companies carried on the business of manufacturing and selling sewing machines as one entire

business. The stock of the manufacturing company, 1,980 shares out of 2,000, was held by the sewing machine company and it paid an agreed dividend to the holders of the balance of the stock, and such was the only accounting had between them. It was held that the discounted notes were not under the circumstances to be regarded as accommodation paper. The facts in that case and those in the one under consideration are so different that comment is hardly necessary.

And in Lumbermen's Trust Co. v. Insurance & Investment Co., 248 Fed. 212, 160 C. C. A. 290, it was held by the Circuit Court of Appeals in the Ninth Circuit that a corporation can guarantee the principal and interest of indebtedness incurred by its subsidiaries. And see General Investment Co. v. Bethlehem Steel Corporation (D. C.) 248 Fed. 303.

In Kendall v. Klapperthal Co., 202 Pa. 596, 52 Atl. 92, it was held that where three corporations were organized to act and did act and were treated by all connected therewith, as virtually branches of a single organization having mutual and interdependent interests and co-operating on lines of common interest and policy for the furtherance of the purposes of one of them, the relation between them was sufficient consideration for assumption by the parent corporation of the duty of reimbursing indorsers of the notes of another of the corporations for loss from their indorsements. The court thought that the absence of strict legal identity between the separate organizations was wholly barren of real merit in a court of equity. "A court of equity does not," the court said, "take a skin deep view of a situation like that here presented. It looks to the substance of the transaction, and not to its mere form of color, and sees things as ordinary men do. Of course, a corporation does not lose its legally distinct and separate personality by reason of the ownership of the bulk or the whole of its stock by another, nor by its joining hands with another in a common enterprise. But it is well understood that for purposes of equity, courts will look behind that artificial personality, and if need be, ignore it altogether and deal with the individuals who constitute the corporation." In that case practically the same persons were associated together for one common purpose under three or four different names corresponding to the several branches of the single common enterprise.

It was the opinion of the referee to whom this matter was originally sent that the various companies which are involved herein were all engaged in one joint enterprise or business venture dominated and controlled by Rose, and that what inured to the advantage of one company inured to the advantage of the others. He thought it "plain" from the testimony of Rose that the guaranteed notes did not represent commercial transactions between himself and the companies which made the notes, but that they were part of a plan for raising money to finance the enterprise in which this group of companies were jointly interested. But the District Judge in reviewing the order of the referee in referring to the matter declared that he could find "no evidence in the record to support this conclusion." And this court coincides in the view taken by the District Judge.

The Coney Island Construction Company was engaged in selling building material at retail. It purchased brick and sand and gravel from the John B. Rose Company. All the stock of the Coney Island Construction Company, with the exception of three shares, was owned by the John B. Rose Company. Rose testified that the John B. Rose Company had no other relation to the Coney Island Construction Supply Company except to sell it material from time to time.

The Mahnken Building Material Company was a dealer in masons' and builders' materials, lime, sand, plaster, and brick, and maintained its yard in the borough of Brooklyn. The John B. Rose Company did not hold any stock of the Mahnken Building Material Company, but sold brick and some sand and gravel to the company.

The N. & W. J. Peck Company was a retailer of building materials in the borough of Manhattan in New York City. The John B. Rose Company owned none of the stock of this company, but sold it material and occasionally sand and gravel.

The Alpha Brick & Holding Company was the maker of only one of the sixteen notes involved in this appeal. The check stubs of John B. Rose fail to show that this company received any of the proceeds of the notes. This company sold brick manufactured by the Rose Brick Company and other companies. The John B. Rose Company apparently had no other relation to this company than that it held three-eighths of its capital stock.

The John B. Rose Company had no other direct relation to the four companies makers of the notes, involved in this case, than as above stated. Claimant has attempted to show, however, an indirect relation between these companies through the medium of the Rose Brick Company. But the John B. Rose Company held none of the stock of the Rose Brick Company, that stock being held by John B. Rose personally and by the estate of his father.

It thus appears that the John B. Rose Company owned the stock of the Coney Island Construction Supply Company which may be properly regarded therefore as technically a subsidiary company, that it owned a large block but not a majority of the stock of the Alpha Brick & Holding Company, and that it owned none of the stock in any of the other so-called subsidiary companies. The fact that the Rose Brick Company owned a majority of the stock of the Mahnken Building Material Company and of the N. & W. J. Peck Company, and that John B. Rose was able to control the affairs of the Rose Brick Company as the executor of his father's estate, does not entitle such companies to be regarded as technically subsidiary companies of the John B. Rose Company, for John B. Rose and the John B. Rose Company cannot be regarded as one and the same even though Rose did own a little more than half of the stock of the latter. To make one corporation technically a subsidiary of another, as we understand it, it is necessary that the one company should itself control the other. And the John B. Rose Company as a company did not control any of these corporations with the single exception of the Coney Island Construction Supply Company. We do not see therefore how it can be said that all these companies were strictly and technically speaking engaged in one com-

mon enterprise. As respects these several companies, excepting the Coney Island Construction Supply Company, it does not appear that the stockholders were the same. The officers certainly were not the same. The John B. Rose Company, as before stated, was engaged in the production of sand and gravel. The evidence is that it sold very little of it to the Peck Company and to the Coney Island Company and "some" to the Mahnken Company. While it acted as a selling agent of the brick manufactured by the Rose Brick Company and sold such material to the Coney Island Company, the Peck Company, and the Alpha Company, those companies do not appear to have confined their purchases to the brick manufactured by the Rose Brick Company. Neither does it appear that the brick which the John B. Rose Company sold was alone that which the Rose Brick Company manufactured. Rose, when asked where his company obtained the brick which it sold, replied: "Along the Hudson river, from the manufacturers." And when asked whether the John B. Rose Company, with respect to everything except gravel and sand manufactured by itself, "simply acted as agent to the manufacturers in disposing of their brick products?" simply replied, "Yes, sir." And Rose testified as to the Alpha Company that it "sold brick manufactured by the Rose Brick Company, and I think they sold brick at that time for other manufacturers; but who they were at that particular date I do not recall."

As against corporate creditors even though two corporations are engaged in the same line of business and have the same officers and stockholders and are run practically as one institution and become sureties for each other, it has been held that such suretyship is illegal and cannot be enforced. Rogers v. Jewell Belting Co., 184 Ill. 574, 56 N. E. 1017. In the case at bar the John B. Rose Company and the so-called subsidiary companies did not have the same stockholders and officers and were not run as practically one enterprise.

An act of a corporation which is ultra vires its charter cannot become binding on the ground of estoppel. Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265; Louisville, etc., Ry. v. Louisville Trust Co., 174 U. S. 552, 567, 19 Sup. Ct. 817, 43 L. Ed. 1081; Bowen v. Needless National Bank, 94 Fed., 925, 36 C. C. A. 553; Park Hotel Co. v. Fourth National Bank, 86 Fed. 742, 30 C. C. A. 409; Merchants' Bank of Valdosta v. Baird, supra.

The conclusion of the whole matter may be stated as follows:

A corporation is ordinarily not bound by its guaranty of the paper of a third person as such a guaranty is foreign to the enterprise for which it was created. The burden of overcoming the presumption of the ultra vires character of the guaranty has not been sustained as it is not established by satisfactory proof that the proceeds of the discounted notes were ever paid to the John B. Rose Company the guarantor, or that the so-called subsidiary companies were engaged with the bankrupt in carrying on what can be regarded as a single enterprise, or that the bankrupt derived any benefit from or had any interest in the guaranty.

The order of the District Court is affirmed.